**Arzel HALEY, Plaintiff–Appellee,**

v.

**Boniface GROSS, Lieutenant McKee, and Michael Ellis, Defendants–Appellants.**

No. 95–1130.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1995.

Decided May 29, 1996.

---

Michael N. Bledsoe (argued), Michael N. Bledsoe & Associates, Chicago, IL, for Plaintiff-Appellee.

Michael A. Wulf, Alix E. Armstead, Office of Atty. Gen., Springfield, IL, Jerald S. Post (argued), Office of Atty. Gen., Civ. Appeals Div., Chicago, IL, for Defendants-Appellants.

Before CUMMINGS, CUDAHY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

On May 16, 1994, a jury found that Superintendent Boniface Gross, Lieutenant Scott McKee, and Sergeant Michael Ellis [1] ("defendants") were deliberately indifferent to the safety of Arzel Haley while he was an inmate at the Menard Correctional Facility, in violation of the Eighth Amendment and 42 U.S.C. § 1983. The jury found that the deliberate indifference of these defendants was a proximate cause of Haley's injuries, which were sustained when another inmate set their joint cell on fire, severely burning Haley and killing himself. The jury found the defendants jointly and severally liable to Haley for $1.65 million in compensatory damages, but did not award punitive damages. The defendants moved for judgment as a matter of law and, alternatively, requested a new trial. After their motions were denied, they appealed. On appeal the defendants maintain 1) that they were entitled to judgment as a matter of law, 2) that trial errors occurred which, at a minimum, require the grant of a new trial, and 3) that they are shielded from liability under the doctrine of qualified immunity. We affirm the jury verdicts of deliberate indifference and the lower court's denial of the defendants' post-verdict motions.

## I.

The denial of a post-verdict motion for judgment as a matter of law, under Rule 50 of the Federal Rules of Civil Procedure, is subject to *de novo* review. *Matlock v. Barnes*, 932 F.2d 658, 663 (7th Cir.), *cert. denied*, 502 U.S. 909, 112 S.Ct. 304, 116 L.Ed.2d 247 (1991). We review a district court's denial of a Rule 50 judgment notwithstanding the verdict motion by asking "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in a light most favorable to the party against whom the motion is directed." *Id.* (quoting *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1213 (7th Cir. 1985)). Thus in determining whether the jury could lawfully find that the defendants

---

1. Michael Ellis is now a correctional captain at Menard Correctional Center, but since he was a sergeant at the time of the relevant events, he will be referred to throughout as "Sergeant Ellis" or simply "Ellis."

were deliberately indifferent to the safety of Haley, we must consider all the evidence that came before the jury at trial and the reasonable inferences therefrom in the light most favorable to Haley. The facts below are presented from this perspective.

On Monday, April 3, 1989, a terrible fire occurred in one of the cells at the Menard Correctional Facility. The fire was set by Kim Wilborn, one of the two inmates housed in the cell. Wilborn was killed in the blaze, and Arzel Haley, his cellmate, was severely burned, requiring extensive, painful skin grafts and months of recovery.[2] The intensity of the fire, described at trial as an "inferno," may have been enhanced by oil-based paint on the walls of the cell. Rescue efforts were halting at best, primarily because very few officers were in the cellhouse at the time the fire broke out and Haley's cell was "deadlocked," meaning it could only be opened with the right key, rather than with the general crank. Haley's deliberate indifference claims are based upon events that preceded this fire.

Haley had been living in cell 35 on the Ten Gallery of the East Cellhouse (cell 10–35) since December of 1988.[3] Wilborn was moved into this cell with Haley on March 17, 1989, approximately two-and-one-half weeks before the fire. Haley and Wilborn did not get along from the beginning. Haley was 19 years old at the time and weighed about 160 pounds. Wilborn, who was generally known by the nickname "Country," was in his thirties and was substantially larger than Haley. Haley, along with various other inmates, testified that Wilborn was widely believed to be crazy by people who observed him at Menard. These inmates consistently described him as "buggy," meaning crazy or disturbed. They noted that Wilborn rarely associated with or talked to other inmates, spent most of his time in his cell, acted peculiarly, talked to himself or his "imaginary friend," would walk around the jail gallery in only his underwear, did not wear shoes, never showered or brushed his teeth, and dressed in smelly, disheveled clothing.

Baron Horton, an inmate who lived in cell 10–38 at the time (three cells down from Haley and Wilborn), testified that the nickname "Country" came from Wilborn's appearance: being barefooted, wearing raggedy clothes, etc. Horton also testified to observing Wilborn talking to a non-existent person while waiting in the "chow line" and drinking coffee with an imaginary friend in his cell—Wilborn had prepared two cups though no one else was around. Horton noted that anyone who saw Wilborn would think he was crazy and that Wilborn "looked as if he needed help." Edward Swift, another inmate at Menard at the time, confirmed that Wilborn was generally thought to be "mentally disturbed" or "crazy," due to his unusual actions and appearance, as well as his non-association with other inmates (being a "loner"). Inmate Clarence Dace, who lived four cells down in 10–39, likewise affirmed these perceptions of Wilborn. The testimony of these inmates, including Haley, would allow the jury to reasonably infer that anyone familiar with Wilborn would perceive that he had mental problems.[4]

Haley testified that he first began requesting to be moved to a new cell on the Wednesday or Thursday preceding the Monday, April 3 fire.[5] Haley testified that he first

---

**2.** Even at the time of the trial, Haley continued to experience physical limitations due to the severe burns, and the jury was allowed to view many of his permanent scars. The amount of the jury verdict is not challenged by the defendants.

**3.** There were five levels of cells, called "galleries," in the area of Menard where Haley and Wilborn were housed. Each gallery contained 50 two-person cells, and the galleries were numbered Two, Four, Six, Eight, and Ten in ascending order.

**4.** Prison records introduced at trial revealed that when Wilborn was interviewed on September 19, 1988 at Joliet Correctional Facility, he reported a history of alcoholism, drug use, auditory hallucinations, a suicide attempt at the direction of one of these voices, being on antipsychotic medications for three years, and psychotic episodes. Although these records were sent to Menard when Wilborn was transferred, there was no evidence presented at trial that any of the defendants were aware of them.

**5.** Haley testified that although he and Wilborn fought from the time Wilborn first moved in, he did not initially ask to be moved because Wilborn kept saying that he (Wilborn) was going to be moved.

spoke to Superintendent Boniface Gross, who was in charge of the cellhouse at the time.[6] He testified that he went to see Gross in his office on Four Gallery during the morning of that Wednesday or Thursday. Haley told him that he and his "celly" (cellmate Wilborn) were having problems and that his celly was crazy and buggy. He explained to Gross why he thought Wilborn was crazy, noting that Wilborn hadn't taken a shower since he moved in, didn't come out of the cell, moved Haley's things around, "tried to start stuff," and tried to intimidate Haley. Haley also told Gross that Wilborn had reported once attempting to burn his own sister's house down. Haley testified that Gross told him that he would check into it and see what he could do. Haley also spoke to Sergeant Ellis about the situation, who he saw on Two Gallery.

Later that day, Haley again saw Superintendent Gross and asked him when he or his celly were going to be moved from their cell. Haley noted that Gross seemed to have forgotten what he was talking about, so Haley reminded him of the information he had earlier conveyed. Haley testified that Gross told him he would check into it before shift change that day, which occurred at 3:00 in the afternoon. Gross never got back to him, however, and Haley did not see him again until the Monday of the fire. Haley also testified, and other inmates confirmed this testimony, that he was known *not* to be a gang member and that at Menard members of "the organization" (i.e., gangs) were substantially more likely to have requests granted.

By Sunday, when nothing had yet been done and realizing that Gross was off for the weekend, Haley went back to Sergeant Ellis, who he spoke to near the sergeant's cage on the way up to the galleries. Haley testified to again telling Ellis about the problems he and his celly were having, though Ellis "knew the situation" when Haley reminded him about it. Ellis told Haley that he would check into it. Haley noted that the conversation was short, five to ten seconds long, since other inmates were hanging out and waiting to talk to Ellis in the area near the sergeant's cage.

At trial Haley described a terrible night with Wilborn that Sunday evening. He testified that they were arguing and that Wilborn had earlier threatened that "something crucial was going to happen if they didn't get him out of the cell" or they didn't get separated that Sunday. When night came on Sunday and they were still together, Haley was terrified. He stayed up until around 3:00 a.m., afraid that if he went to sleep Wilborn would "try something." Not only did Wilborn threaten him, but he was acting strangely, walking around the cell, and not going to sleep. When Haley woke up Monday morning, he went to breakfast and then went directly to Superintendent Gross's office, but he still wasn't around. So Haley went and found Sergeant Ellis and told him about his continuing problems with his cellmate. The jury could have inferred from Haley's testimony, though it was less than perfectly clear, that Haley told Ellis about how Wilborn had threatened him. Once again, Ellis said he would "check into it."

Between 11:00 and 12:00 that Monday morning, on his way back from morning yard, Haley found Superintendent Gross on Two Gallery talking to inmates outside the sergeant's cage. Haley again requested that he and Wilborn be separated. Haley testified that Gross appeared not to remember him, so he once more explained the situation and why he wanted to be separated from his celly. This time Gross told Haley that he should check back with Gross. Later that day, after discovering that Wilborn was deadlocked in their cell,[7] though Haley did

---

6. Captain John Inman testified that the "reporting structure" at Menard, starting at the bottom of the correctional ladder, was officer, sergeant, lieutenant, captain, cellhouse superintendent.

7. When a cell is "deadlocked," it cannot be opened with the general crank that opens the other cells, but must be individually opened with a key. An inmate can be deadlocked at Menard due to either "protective custody" (for his own protection from other inmates) or for "disciplinary deadlock" (for violating a rule). An inmate who is deadlocked is not allowed to leave the cell. While Menard has a special unit of single-person cells for inmates on deadlock status, when that unit is full, two-person cells can also be individually deadlocked. In that case, the deadlocked person would be stuck in the cell all

not know why, he again went in search of aid. Haley waited around for awhile near the sergeant's cage on Two Gallery for a sergeant or superintendent to return. Eventually Superintendent Gross came in, and Haley again spoke to him about getting moved. While Haley's testimony on the conversation is a bit vague, the jury could have reasonably inferred that Haley told Gross that his cellmate—of whom he was already afraid—was now deadlocked in their cell. The fact that Wilborn was deadlocked may have indicated that he had violated some rule and definitely meant it would be much harder for Haley to get in and out of the cell, since he would have to be individually keyed in and out each time. Superintendent Gross, like all the defendant officers, was very familiar with the implications of a cell being deadlocked. Haley testified that he saw Gross a total of four or five times that Monday in different areas of the cellhouse, each time asking to be separated from Wilborn.[8] Yet nothing was getting done.

Growing frustrated with the lack of results, Haley then went to Captain John Inman about the situation.[9] When Inman learned that Haley was already in contact with Sergeant Ellis and Superintendent Gross, however, he assured Haley that they were taking care of the issue, so he need not get involved. Later that afternoon Haley found Sergeant Ellis down by the sergeant's cage. Haley told Ellis again how he and his celly weren't getting along, that Wilborn was crazy and had been moving his stuff around and trying to intimidate him and to "start something," that it was getting close to shift change, and that Wilborn was now deadlocked in their cell. Haley testified that another inmate was with him at the time he talked to Ellis. Inmate Clarence Dace testified that he was the one with Haley during this conversation and that he told Ellis that "everyone knows that Wilborn is bugged" (crazy) and that Haley shouldn't be in a cell

with him. Ellis told Dace to mind his own business and that he wasn't moving Haley.

In fact, Sergeant Ellis was well aware that Wilborn was deadlocked in the cell, since he was the one who put Wilborn on protective custody status. Ellis testified that he worked the 7:00 a.m. to 3:00 p.m. shift on the Friday, Saturday, Sunday, and Monday before the Monday evening fire. He was at home when the fire actually occurred. Ellis testified, however, that on that same Monday, Wilborn had approached him around lunchtime requesting protective custody ("p.c.") status and to be moved out of the cellhouse. According to Ellis, Wilborn would not specify why he needed protection and simply kept saying that he couldn't "get along" and wanted to be moved out of the cellhouse. Although the protective custody request sheet provided an area to explain why the protection was being sought, Wilborn's p.c. request listed no reason. While Sergeant Ellis admitted that normally protective custody is not given automatically and that he would generally seek specifics and require a good reason, he gave Wilborn p.c. status even though Wilborn would not specify why he wanted it.

What exactly occurred between Ellis and Wilborn that day is somewhat difficult to determine, since the story told by Ellis at trial was so different than the story he told in his earlier sworn interrogatory answers, which the jury heard when Ellis was impeached with them. At trial Ellis testified that after Wilborn made his request, Ellis told him he would look into it. Ellis testified that he then checked into the matter, and when Wilborn came back after lunch, he told Wilborn that there was no room in the segregation unit. Ellis testified that he then took Wilborn up to his cell and locked him up, only later receiving the signed p.c. request form, which had been signed in front of another officer. The jury learned, however, that in a long-winded interrogatory answer,

day, and the other person would have to be let in and out by a guard with the key.

8. Gross testified that he was the administrative duty warden at Menard on the day of the fire, thus necessitating that he stay until after the post-supper count was completed. He testified

that at the time of the fire, he was in the Menard Administration Building.

9. Captain Inman was also a defendant at trial, but the court directed a verdict in his favor at the close of the evidence.

Ellis told a rather different story. This time Wilborn signed the p.c. form in front of him, after Ellis suggested going on p.c. status in his cell until room was available in the segregation unit; however, Wilborn didn't actually get put on p.c. status at that point. Ellis asserted in the interrogatory answer that later that day he was called to Ten Gallery, where Wilborn was upset about not being moved or put on p.c. status. Wilborn became belligerent at this point and had to be physically placed in the cell. Ellis also wrote in his interrogatory answer that Wilborn was given a disciplinary ticket for this incident, though prison disciplinary records revealed (and Ellis admitted at trial) that no disciplinary ticket was actually written for Wilborn that day.

As if the jury had not heard enough confusing testimony, after being impeached Ellis then went on to claim that he had actually had only a *single* incident with Kim Wilborn that day, which simply involved Wilborn requesting p.c. status, refusing to return to his cell, and Ellis then placing him in the cell. Nevertheless, at some point that April 3, 1989, Sergeant Ellis signed the Menard Temporary Confinement Sheet stating that Wilborn had been put on protective custody status in cell 10–35. This form, which was introduced into evidence, also revealed that Wilborn was the only one on his gallery on p.c. status at the time, out of the 87 inmates on Gallery Ten. Ellis admitted at trial that there were other available cells in East Cellhouse in which he could have put Wilborn, away from Haley.[10]

Haley testified that when he went to his cell at the time of the 3:00 p.m. shift change on that Monday, Officer Benjamin Russell (who the inmates called "Pontiac") had to come let him into the cell, since it was dead-

locked.[11] Haley testified that Wilborn was acting aggressively toward Russell at the time and that Wilborn told Russell that he wanted to be separated from Haley and that he didn't understand why he hadn't been moved. Haley later was allowed out to go to dinner. When he came back, Officer Russell had to let him in again, and Haley told him at this point that he didn't want to go back in the cell with Wilborn, who was also asking why he hadn't been moved and telling Russell to go see when he was going to be moved. Russell told Haley to go into the cell or he would be given a disciplinary ticket.[12] So Haley went in, and the cell was deadlocked for the night.

Officer Russell then went back to getting other inmates into their cells for the 4:00 p.m. count—which followed dinner and which all agree was ongoing long after 4:00— when all the inmates would be counted to make sure no one was missing.[13] After Russell left, Wilborn kicked over the boxes containing Haley's things, including Haley's pictures and mail, and then ran over and jumped up on his bunk. This made Haley angry, since it wasn't the first time Wilborn had messed with his things, so he started yelling at Wilborn, and they got into a big argument. Russell came back when he heard all the commotion and found Wilborn and Haley screaming at each other, Wilborn on the top bunk leaning over and Haley standing in front of him, their faces only six inches apart. Officer Russell testified that he called over Sergeant George Stewart, who was already on the gallery and who was ranked above him, to help control the situation.[14] Sergeant Stewart testified that he soon after radioed Lieutenant Scott McKee to come to the scene. Stewart's incident report, written approximately four hours af-

---

10. Sergeant Ellis also stated that at the 3:00 shift change he gave the log to his replacement, Sergeant George Stewart, who would then have reviewed it and seen that Wilborn was on p.c. status.

11. Officer Russell was a defendant at trial as well, but the jury rejected Haley's deliberate indifference claim against him.

12. A disciplinary ticket would have increased Haley's time in prison. Officer Russell admitted

that he had to let Haley into his cell, but denied that Haley resisted in any way.

13. As the defendants emphasize repeatedly, the following events, leading up to the fire, occurred before the final completion of the cellhouse count.

14. Sergeant Stewart was also a defendant at trial, but the jury rejected Haley's deliberate indifference claim against him.

ter the encounter, indicated that he arrived at approximately 5:15 p.m., and McKee arrived at approximately 5:18 p.m. The jury could certainly have inferred, from the fact that both Russell and Stewart were unable to control the situation and had to call in a superior officer, that the situation in cell 10–35 was extremely volatile by the time Lieutenant McKee arrived. In fact, Sergeant Stewart testified that he called Lieutenant McKee because he was unable to contain the situation or get any results.

Meanwhile, Haley and Wilborn continued to battle verbally. Haley tried to get Wilborn to come down and face him, saying "Get down off the bunk. Get down off the bunk. What you want to do now? I'm tired of you intimidating me"; but Wilborn continued to taunt him, saying "What you going to do, pussy? What you going to do?". Haley then went and knocked Wilborn's stuff off the shelf. At some point, just as they were ready to start physically fighting,[15] Lieutenant McKee arrived and yelled in, "What's going on?".[16] Haley testified that he then told McKee the problems that they had been having for two weeks, that Wilborn had been trying to intimidate him, that Wilborn had knocked his stuff down, and that Wilborn was crazy and one of them needed to be moved.[17] When the arguing between Wil-

born and Haley resumed, Lieutenant McKee ordered Wilborn to come down off his bunk, come to the cell bars, and speak to him. When Wilborn did nothing, McKee repeated the order, but Wilborn still refused to move. Wilborn and Haley continued to yell at each other and at McKee to move them during this time. According to Haley's testimony, when McKee threatened that he was just going to leave them, Wilborn shouted out, "If you walk away, I'll burn this mother fucker down, you fucking honkey."[18] At that point McKee lashed out, saying "Well, go ahead, you nigger, burn your black asses. You've got to be in there."[19] And he walked away, followed by Stewart and Russell.

Haley testified that as they walked off he grabbed the bars and screamed for McKee to come separate them, yelling "Come get me out of [this] cell." Haley kept yelling until they were too far away to hear him, but no one turned around or came back; and all three of them left the cellhouse. At that point Haley turned around, and Wilborn said to him, "You're going to die tonight." Haley realized he was stuck with Wilborn for another night, so he went over and sat down on his bed. Although his normal routine was to put his pajamas on before going to sleep, Haley remained in his prison-issue clothes, with his shoes and coat on. He testified that he

---

**15.** Officer Russell testified that the inmates were yelling and agitated when McKee arrived and that they had *not* calmed down. Sergeant Stewart testified that when McKee arrived, Wilborn was "combative" and the arguing was "loud." In addition, although Stewart denied at trial that the inmates appeared about to physically fight, he was impeached by his incident report (they "were attempting to fight"), earlier deposition testimony (indicating his suspicion that "these two possibly may fight"), and the summary by internal investigators of his statement to them that night (they "appeared about to start fighting").

Although Lieutenant McKee stubbornly insisted at trial that the situation in cell 10–35 when he arrived was quiet and calm, that there was absolutely no arguing, yelling, or fighting going on, and in fact that he really wondered why a sergeant would call him up to come look at two quiet inmates just sitting in their cell, his testimony must have appeared frightfully non-credible to the jury.

**16.** Haley testified that he had never seen Lieutenant McKee before this incident, and McKee like-

wise testified that he had no involvement with either Haley or Wilborn prior to April 3, 1989.

**17.** Sergeant Stewart confirmed Haley's testimony, testifying at trial (as he had stated in his initial incident report) that Haley told McKee that Wilborn was crazy, that he was moving Haley's stuff around, and that he was going to tear up Haley's property.

**18.** The substance of this threat to "burn the place down" was confirmed by both the testimony and incident reports of Officer Russell, Sergeant Stewart, and Lieutenant McKee. These incident reports were filled out the evening of the fire. Russell testified that Wilborn's conduct was "aggressive" at this time, and McKee described Wilborn's talk as "aggressive" in his incident report.

**19.** Inmate Edward Swift testified that Lieutenant McKee was known to be a racist and to ignore the requests of black inmates. Haley and Wilborn were both black.

didn't lay down or get ready for bed because he was uncomfortable and felt like something was going to happen. Eventually Haley dozed off, however, exhausted from the previous night of little sleep, the arguments, and all the running around he had done on Monday trying to get moved.[20]

Haley testified that he believed he had been dozing only for five or ten minutes when he awoke to the smell of smoke. When he woke up, he found all sorts of paper and rolls of toilet paper burning in their cell, in the area in the back between the sink and the toilet. There was a sheet hanging from the ceiling around the toilet area (for privacy purposes), which was then catching on fire. Haley ran to the bars at the front of the cell and starting yelling for help, but there were no officers on the gallery.[21] Inmate Edward Swift was on the gallery, however, having come back late from his prison job, and Haley called him. By then Wilborn was back sitting on his bunk, saying "I told you you're going to die tonight. You're going to burn." Wilborn then reached over and took the t.v. off the stand and threw it at Haley, who caught it. When Swift arrived, Haley was standing there holding the television. When Swift saw what was going on, he ran to get help.[22] Meanwhile, Wilborn came down and was lighting more things on fire, including more paper and the boxes they had used as stands for the t.v. and radio. After kicking the boxes into the fire, he slammed the radio to the floor.

The fire grew, and Haley continued to scream for help. Eventually Officer Donald Nicholson, the catwalk officer on duty at the time, ran down and stopped in the catwalk area in front of the cell.[23] Nicholson told Haley to lay down, which he did, as he felt the fire blazing out of the cell from behind him.[24] Haley testified that Wilborn remained in the back of the cell laughing and at one point tried unsuccessfully to drag Haley back into the fire with him. By then the fire was burning up the walls.[25] Haley testified that at some point McKee came with a fire extinguisher and sprayed the fire, which went down temporarily, but then came back as powerful as ever. Haley testified that McKee ran off after the extinguisher was

20. The suggestion by the defendants that Haley's going to sleep establishes that he was not really afraid of Wilborn is hardly the only interpretation of the evidence and certainly does not constitute construing the evidence and the inferences therefrom in favor of the party who prevailed at trial, i.e., Haley.

21. Haley testified that at some point he pulled down the privacy blanket that was hanging over the front of the cell, which had evidently been put up by Wilborn, perhaps so his fire-starting activities would not be immediately noticed.

22. Swift confirmed that when he first arrived, Haley was standing near the bars holding a television. Swift testified that there was a small fire going in the cell and that Haley told him to get an officer. Swift then walked down and told the catwalk officer that someone wanted to speak to him in cell 10–35 "because he says his celly's trying to burn him up." Swift testified, however, that he did not initially tell the catwalk officer that there was actually a fire going. When Swift returned to the cell and saw that Wilborn had set additional fires and that they were much bigger, he ran back to the catwalk officer and told him about the fires. This time the officer, Officer Nicholson, came down. Swift testified that he then began running from cell to cell asking for water to put out the fire, though the cups of water he was given had no effect on the blaze.

23. Officer Nicholson testified that the "catwalk" is a long caged area that runs the length of the gallery, from which the catwalk officer can observe the entire cellhouse, though he cannot physically reach any of the galleries. The catwalk is suspended from the opposite cellhouse wall, about 15 feet from the Eight Gallery—the level below Ten Gallery where Haley and Wilborn were housed. It was Nicholson's job to watch the five galleries on that side of the cellhouse. Although there were normally two catwalk officers on duty, the other officer was at dinner at the time the fire broke out.

24. Nicholson testified that when he arrived in front of the burning cell, where the fire was "going wild," Haley was at the front of the cell at the bars yelling "get me out." Nicholson immediately called for assistance on his radio and attempted to hook up the fire hose on the catwalk. The hose was too short, however, and by the time he could add another length of hose, he could not get enough water pressure to reach the cell on Ten Gallery. Haley continued to scream "get me out" as the flames engulfed the cell. Nicholson did not, however, ever see or hear Wilborn.

25. Officer Nicholson testified that the paint on the walls started burning, and then the fire "took off like wild."

empty, without letting him out.[26] The cell could not be opened with the general crank, since it was deadlocked. McKee testified that he did not have the right key and that he called "somebody," though he wasn't sure who, to bring it. Haley told the jury that he just lay there alone, hollering and yelling, and told himself just to take the pain and die. Eventually, approximately twenty to thirty minutes after the fire began, Officer Mifflin arrived with the right key, kicked the door open, and Mifflin and Inmate Swift helped Haley get out of the blazing cell, saving his life.[27]

Most of the above facts come from the trial testimony of Haley. The defendant officials testified quite differently. Superintendent Boniface Gross testified that inmates frequently requested things from him and that even though he worked the Thursday and Friday preceding the fire, as well as the Monday of the fire, he did not recall any conversations with Haley. Sergeant Michael Ellis also testified that he did not recall having any conversations with Haley prior to

the fire and that Haley did not ask him for anything on the day of the fire. Ellis did not recall any exchange with Inmate Dace on the day of the fire either. Lieutenant McKee testified that although there was *no* yelling or arguing going on at cell 10–35, he made the determination that Haley and Wilborn needed to be separated.[28] In fact, he testified that as he and the other officers walked away, he told Sergeant Stewart to find an empty cell to move Wilborn into and that he also told the catwalk officer to keep an eye on cell 10–35. McKee admitted at trial, however, that he did not say anything to Wilborn and Haley about this planned move or give them any indication that he intended to have them separated.[29] It was also revealed at trial that on April 3, 1989, there was an empty cell just two cells down the gallery, cell 10–37, and that there were numerous other cells in the East Cellhouse that were either empty or contained only one inmate that night.[30] Lieutenant McKee testified that, as a lieutenant, he had the authority to

26. This testimony was confirmed by McKee's incident report on the night of the fire, which stated that the entire cell was covered in flames when he arrived and that although he used an entire fire extinguisher, he was unable to put out the fire. McKee also testified, however, that he was still at the cell when Officer Mifflin came with the keys and saved Haley. Officer Mifflin, who received an award for saving Haley's life, testified that when he came running in with the keys, McKee was running away to get air packs.

27. Apparently the fire was eventually put out by inmates, who climbed up the steel grillwork on the outside of the galleries from Two Gallery to Ten Gallery (4 levels up) carrying fire hoses, which they sprayed into the cell. Officer Nicholson described this strange scene to the jury, which also explained why he was unable to get enough water pressure, since his hoses were connected to the same standpipe as those of the inmates.

28. McKee's incident report from that night, which was admitted into evidence, stated that he told Stewart to move Wilborn because of his "aggressive talk and his P.C. deadlock status." Thus the jury could have determined that McKee knew that Wilborn was in protective custody that night.

29. Sergeant Stewart testified that as they left, Lieutenant McKee told him to locate an empty cell, though no one notified the inmates that one of them would be moved. Officer Nicholson

likewise testified that McKee did tell him to "keep an eye on" cell 10–35, though at the time Nicholson was also responsible for monitoring the 249 other cells in the cellhouse. McKee estimated that there were probably 400 inmates in the East Cellhouse at the time.

Captain Inman testified, though grudgingly so, that he would have separated the inmates if he had confronted the situation that McKee did and that McKee had the power to immediately separate the inmates and then deal with the placement office later. Inman also testified that it was not reasonable for officers to walk away from a situation where inmates were about to fight and that he would advise his staff not to walk away from such a situation. Similarly, Superintendent Gross testified that the minimum an officer should do in a situation like the one McKee and the others confronted is to tell the inmates that you will try to get them moved.

30. Wayne Ellner, the Record Office Supervisor at Menard, confirmed the testimony of various inmates that cell 10–37 was indeed unoccupied that night and noted that there were at least four other cells on Ten Gallery housing only one inmate at the time. While some of the empty cells in the cellhouse may not have been operational, the defendants did not deny that there was available space in the cellhouse to have either Wilborn or Haley moved immediately. In fact, Officer Russell testified that he remembered there being cells on Ten Gallery that held only one inmate that night.

move one of the inmates to a different cell, but that Officer Russell and Sergeant Stewart did not have this authority.[31]

There was substantial testimony at trial regarding prison rules about when inmates could be moved and what other options could be used when inmates needed to be separated. Sergeant Ellis testified that inmates could *only* be separated if they were physically fighting. Superintendent Gross, on the other hand, testified that inmates can be moved before they are physically fighting and that the idea is to separate inmates before they are actually hitting each other, in order to protect them from being harmed or injured. Regarding the count, Lieutenant McKee testified that there was an unwritten rule at Menard that no one could be moved while a count was ongoing, as it was on April 3, 1989 when he was at cell 10–35. He later admitted, however, that inmates could be separated during count, but only if they were physically fighting. Captain Inman testified that inmates could be moved during count under certain circumstances, that he had seen inmates moved during counts, and that a lieutenant confronted with the situation that McKee observed in cell 10–35 that night could have moved one of the inmates, even during count. He explained that an inmate moved during count could still be marked as present in his cell for paperwork purposes. Superintendent Gross testified that he agreed with Captain Inman that inmates could be moved during count and still be counted as being on the gallery.

The testimony of the various officers also revealed a range of possible techniques that have been used at Menard for dealing with feuding inmates: one could be moved to an empty cell; one could be moved to a cell containing only one other inmate; one of the inmates could be "flip-flopped" with an inmate from a different cell; an officer could be left outside the cell to monitor the inmates; one of the inmates could be tempo-

rarily placed in the sergeant's cage area; or one of the inmates could be temporarily placed in the holding pen next to the sergeant's cage. None of these options was implemented for the inmates in cell 10–35 on the evening of April 3, 1989.

## II.

■ In *Farmer v. Brennan,* —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the Supreme Court held, as it had previously assumed, that "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Id.* at ——, 114 S.Ct. at 1976 (internal citations omitted). Each of the defendants admitted at trial that they were aware of this duty. The *Farmer* Court acknowledged: "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' ... having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at ——, 114 S.Ct. at 1977 (internal citations omitted); *see also McGill v. Duckworth,* 944 F.2d 344, 347 (7th Cir.1991) (finding duty to protect prisoners from each other is "logical correlative" of state's obligation to replace means of self-protection among its wards), *cert. denied,* 503 U.S. 907, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992). While every injury suffered by one prisoner at the hands of another does not constitute a violation of the Eighth Amendment prohibition on "cruel and unusual punishments," if deliberate indifference by prison officials effectively condones the attack by allowing it to happen, those officials can be held liable to the injured victim. —— U.S. at ——, 114 S.Ct. at 1977.

The *Farmer* Court clarified the standard for compensable "deliberate indifference" in the prison context. First, the danger to the inmate must be objectively serious, posing a substantial risk of serious harm. Second, the

---

**31.** The statement that officers and sergeants did not have the authority to unilaterally move feuding inmates at Menard, though lieutenants did, was confirmed by Captain Inman, Sergeant Stewart, and Sergeant Ellis. Even the corrections expert called by Haley concluded that officers and sergeants at Menard were not autho-

rized to move inmates. Perhaps this testimony helps explain why the jury found that Officer Russell and Sergeant Stewart were not deliberately indifferent to Haley's welfare, even though they both heard Wilborn's threat and then left without doing anything to assuage the situation.

prison official must have a sufficiently culpable state of mind-one of "deliberate indifference" to inmate health or safety. The Court summarized the state of mind requirement for deliberate indifference as follows:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he also must draw the inference.

> *Id.* at ——, 114 S.Ct. at 1979. Thus we can uphold the jury's findings that Superintendent Gross, Sergeant Ellis, and Lieutenant McKee were deliberately indifferent to Haley's safety only if we conclude that the jury could reasonably find that these defendants had *actual knowledge of a substantial risk of serious harm* to Haley from Wilborn.

The *Farmer* Court emphasized the importance of the "actual knowledge" prong, finding that because the Eighth Amendment relates only to "punishment," it is not enough that the official "should have known" of a substantial risk or that a reasonable officer in the situation would have known of the risk. The Court insisted that negligence on the part of the officer is insufficient to impose liability: "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* Thus the Court affirmed the subjective knowledge test that has been the rule in the Seventh Circuit at least since *McGill v. Duckworth,* 944 F.2d 344 (7th Cir.1991).

■ On the other hand, the Supreme Court also acknowledged in *Farmer* that actual knowledge of a substantial risk of serious harm can be *inferred* by the trier of fact from the obviousness of the risk:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

—— U.S. at ——, 114 S.Ct. at 1981. While a jury is not required to infer actual knowledge from the conspicuous nature of a risk, it is allowed to do so. The *Farmer* Court further clarified that a prisoner claiming deliberate indifference need not prove that the prison officials intended, hoped for, or desired the harm that transpired. The standard for deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at ——, 114 S.Ct. at 1978; *see also Price v. Sasser,* 65 F.3d 342, 345 (4th Cir.1995). Furthermore, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." —— U.S. at ——, 114 S.Ct. at 1981. Thus Haley did not need to prove that any of the defendants *intended* that Wilborn harm him or that they actually *believed* that Wilborn would harm him. It is enough for Haley to show that the defendants *actually knew* of a substantial *risk* that Wilborn would seriously harm him. To the extent that any language in our prior cases may have suggested that a plaintiff inmate making a deliberate indifference claim must establish that prison officials intended the harm that ultimately transpired, those statements do not accurately state the law in this circuit post *Farmer v. Brennan. See, e.g., Gibbs v. Franklin,* 49 F.3d 1206, 1207 (7th Cir.) ("[T]he issue is whether the guards *intended* that Gibbs be injured by their failure to timely intervene.") (emphasis in original), *cert. denied,* —— U.S. ——, 116 S.Ct. 167, 133 L.Ed.2d 109 (1995);[32] *Hous-*

---

32. *Gibbs* was a jury instruction case originally decided less than three months before *Farmer. See Gibbs v. Franklin,* 18 F.3d 521 (7th Cir.1994). After releasing *Farmer,* the Supreme Court vacated the original panel decision in *Gibbs* and re-manded the case to the Seventh Circuit for further consideration in light of *Farmer.* —— U.S. ——, 115 S.Ct. 307, 130 L.Ed.2d 271 (1994). The *Gibbs* panel concluded, however, that both the original judgment and opinion were consis-

*ton v. Sheahan,* 62 F.3d 902, 903 (1995) (per curiam) ("Damages do not follow from knowledge of a problem; the [officials] must intend to harm the prisoner.") (citing *Farmer*).

■ Evaluating Haley's deliberate indifference verdicts in light of the preceding discussion, and remembering that when we review a district court's denial of a post-verdict motion for judgment as a matter of law, we construe the facts presented and all reasonable inferences therefrom in the light most favorable to the party who prevailed at trial, i.e., Haley, we conclude that the district court properly rejected the defendants' Rule 50 motion. A jury could have reasonably found that Superintendent Gross, Sergeant Ellis, and Lieutenant McKee were deliberately indifferent to the safety and welfare of Haley.

We begin with Lieutenant McKee, whose behavior appears to constitute a paradigm case of deliberate indifference. When McKee was called to cell 10–35 by Sergeant Stewart, he was confronted by an extremely volatile situation. Haley and Wilborn were screaming at each other, appeared ready to fight physically, and two other prison officers had been unable to diffuse the intense quarrel. Lieutenant McKee was told by Haley about what had been happening, that Wilborn was intimidating him and moving his things around, and that Wilborn was crazy. McKee's incident report reveals that he also knew that Wilborn was on protective custody deadlock status, making it more dangerous for Haley to be with him because it would be more complicated to get either one of them out of the cell if necessary. McKee's initial response to the situation was not unreasonable. He listened to Haley and ordered Wilborn to come down to the bars and talk to him. Even threatening to walk away if Wilborn did not obey may have been reasonable. However, when Wilborn specifically threatened to burn the cell down if McKee left, and having observed Wilborn and Haley and how explosive the situation already was, and having heard what they were saying about their ongoing battles and desperate desire to be

separated, it was reasonable for the jury to conclude that McKee manifested a deliberate indifference to Haley's safety by walking away with nary a hint that he intended to do anything about the situation. Deliberate indifference can hardly be more succinctly demonstrated than by McKee's words as he left that night: "Well, go ahead, you nigger, burn your black asses. You've got to be in there."

The cases of Superintendent Gross and Sergeant Ellis are not nearly so blatant; but the test for deliberate indifference does not require a prison official to affirmatively proclaim, as Lieutenant McKee effectively did, "Go right ahead and assault each other because I'm not looking and I don't care." As noted above, the test is whether the official had actual knowledge of a substantial risk of serious harm to the inmate. According to Haley's testimony, he spoke to Superintendent Gross no less than four and perhaps as many as seven times about the problems he was having with Wilborn and the need to move one of them out of the cell. The jury could have reasonably found that, due to these conversations, Gross knew that Haley and Wilborn were feuding, that Wilborn acted like he was crazy, that Wilborn was intimidating Haley, and that Wilborn had previously attempted to burn his sister's house down. In addition, the jury could have reasonably found that by the Monday of the fire, Gross actually knew that Wilborn presented a substantial danger to Haley, which was enhanced because their cell was then deadlocked. Thus we cannot say, as a matter of law, that Gross did not have actual knowledge of a substantial risk of serious harm to Haley, which he deliberately disregarded by leaving Haley in the same cell with Wilborn. Repeatedly stating that he would "see what he could do" and "check into the situation," without ever actually doing anything, was not an acceptable response to the substantial risk of harm to Haley that the jury determined Gross perceived.

tent with *Farmer*. 49 F.3d at 1207, 1208. Yet because the focus of *Gibbs* was on the "readily preventable" language, rather than the "specific intent" language, contained in the challenged

jury instruction, and because the instruction in *Gibbs* only required specific intent *or* deliberate indifference, we need not and do not overrule *Gibbs*.

We uphold the jury's finding of deliberate indifference against Sergeant Ellis on similar grounds. Haley testified that he originally spoke to Ellis about the situation in cell 10–35 on the same Wednesday or Thursday that he first spoke to Gross. Haley again spoke to Ellis on that Sunday, at which time Ellis indicated that he did know about the problems and that he would check into it. After a terrible Sunday night, on Monday morning Haley went and told Sergeant Ellis about the continuing feuds in cell 10–35, including how Wilborn was intimidating him, acting strangely, and had threatened Haley that "something crucial was going to happen" if one of them wasn't moved. Ellis said he would "check into it," but nothing happened. Haley testified that later that day he returned to Ellis and again told him how Wilborn was crazy, was trying to intimidate him and "start something," and that Wilborn was now deadlocked in their cell—a fact with which Ellis was already intimately familiar, since he was the one who put Wilborn on protective custody deadlock status in the first place. Yet still Ellis made no attempt to get either of the inmates moved or even to further investigate the situation. Even though Ellis was not present when the fire began, the jury could have reasonably concluded that by that Monday evening, Sergeant Ellis had actual knowledge of a substantial risk of serious harm to Haley from Wilborn and that he deliberately disregarded that risk by doing nothing about it.[33]

## III.

■ Because we reject the defendants' claim that they were entitled to judgment as a matter of law, we now consider their arguments that certain trial errors necessitate a new trial. We review a district court's denial of a motion for a new trial under an abuse of discretion standard. *Grassi v. Information Resources, Inc.*, 63 F.3d 596, 601 (7th Cir. 1995); *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir.1991). The defendants claim they were entitled to a new trial due to erroneous jury instructions, improper expert witness testimony, and the admission of certain photographs.

The defendants challenge the following language in one of the jury instructions: "Reckless disregard occurs where the defendant disregards a substantial risk of danger that is either known or would be apparent to a reasonable person in the defendant's position." The defendants argue that this language was improper because it allowed the jury to find deliberate indifference based on what the defendants "should have known," rather than what they actually knew. The defendants, however, face two major hurdles to making this challenge: 1) waiver and 2) the remainder of the jury instructions given.

■ Federal Rule 51 clearly states that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." FED.R.CIV.P. 51. The defendants nowhere objected to the language that they now claim was erroneous and prejudicial, though they had the opportunity to do so at both the jury instruction conference and again at trial just before the instructions were given. In fact, Haley argues that the defendants, at the request of the trial court, stipulated to the instructions that they now attempt to challenge. We have reviewed the transcript of the purported stipulation, but we find it unclear regarding which specific instruction was stipulated to by the defen-

33. The *Farmer* Court noted that when a prison official is "aware of an obvious, substantial risk to inmate safety," he cannot escape liability by establishing that "he did not know that the [inmate] was especially likely to be assaulted by the specific prisoner who eventually committed the assault." —— U.S. at ——, 114 S.Ct. at 1982. Likewise, Sergeant Ellis and Superintendent Gross are no less liable for deliberate indifference because, while they knew that Wilborn presented a substantial risk of serious harm to Haley, they may not have envisioned that Wilborn would light the cell on fire. While there must be some link between the risk of which the official was aware and the harm that actually occurred—as it would be unfair to hold officials liable for risks they could not have anticipated simply because they ignored other unrelated risks—prison officials need not be specifically aware of the precise risk that unfolds. It is sufficient that Ellis and Gross knew that Haley was in danger of some kind of attack from Wilborn and made no attempt to prevent it.

dants; hence we do not find that the defendants stipulated to the instruction now challenged. On the other hand, the defendants suggestion that remarks made at the close of evidence in support of their motion for judgment as a matter of law—which addressed the proper legal standard for deliberate indifference and emphasized the need for actual knowledge—somehow constituted an implicit objection to the jury instruction language that they now challenge is meritless. One of the basic purposes of Rule 51 is to give district courts the opportunity to amend erroneous jury instructions, thus avoiding the need for appellate consideration of the issue and potential re-trial. An entirely separate discussion about whether the facts presented at trial entitle a party to judgment as a matter of law is hardly fair notice to the trial court that the same party takes issue with certain jury instruction language.

■ Failure to challenge a jury instruction in a civil case constitutes waiver of that challenge and precludes appellate review. *See Deppe v. Tripp*, 863 F.2d 1356, 1362 (7th Cir.1988) (holding that "in civil cases a plain error doctrine is not available to protect parties from erroneous jury instructions to which no objection was made at trial"); *see also Doe v. Johnson*, 52 F.3d 1448, 1458–59 (7th Cir.1995); *Bogan v. Stroud*, 958 F.2d 180, 184 (7th Cir.1992); *Sims v. Mulcahy*, 902 F.2d 524, 535–36 (7th Cir.), *cert. denied*, 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990). We note that even if the defendants had objected at trial, they could not have established that the instructions as a whole were insufficient to inform the jury correctly of the applicable law or that the instructions so misguided the jury that they were prejudiced. *See Miller v. Neathery*, 52 F.3d 634, 637 (7th Cir.1995); *Maltby v. Winston*, 36

F.3d 548, 560 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995).

■ In addition to the challenged language, the complete challenged instruction contained language stating that 1) "Negligence or even gross negligence will not establish a constitutional violation"; 2) "Mere inadvertence or negligence is not enough to support a § 1983 action raising Eighth Amendment issues"; and 3) "In a § 1983 case, the plaintiff must prove that the defendants had actual knowledge of impending harm readily preventable, so that a conscious culpable refusal to prevent harm can be inferred from the defendant's failure to prevent it." [34] In addition, a separate jury instruction clearly directed that the plaintiff had to prove, "First, that a defendant had actual knowledge of impending harm readily preventable" and noted that the defendants were not liable if this proposition had not been proved. While the sentence challenged by the defendants does seem to invoke an improper reasonable person test for knowledge, the jury instructions as a whole definitely required actual knowledge and thus could not have prejudiced the defendants.

■ The defendants also challenge the testimony of plaintiff's expert, Thomas Rozzaza, claiming that he was improperly allowed to testify concerning the legal standards governing the case. We review the trial court's admission of expert testimony under an abuse of discretion standard. *Buscaglia v. United States*, 25 F.3d 530, 532 (7th Cir.1994). Thomas Rozzaza was called by Haley as an expert in the area of corrections and prison management, who had over 27 years of work experience in corrections. He

---

**34.** This jury instruction language is consistent with a number of our pre-*Farmer v. Brennan* cases. *See, e.g., Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986); *McGill v. Duckworth*, 944 F.2d at 348. We note that, in light of *Farmer*, such an instruction is no longer advisable because it may suggest to the jury that prison officials need not respond to a substantial risk of serious harm unless the risk is "readily" or easily preventable. *Farmer* only stated that prison officials who "responded reasonably to

the risk" could not be found liable; the Court did not say that the only responses required are the easy ones. *Id.* at 1982–83. *But see Gibbs*, 49 F.3d at 1208 (upholding same jury instruction language because it merely "referred to one way in which the jury could infer intent on the part of the prison guards"). While doing nothing in the face of a substantial danger that is easily or readily preventable does make an official look particularly culpable, we should not invite juror confusion regarding whether the Eighth Amendment requires anything more than doing what is easy.

was allowed to testify regarding what he believed to be the proper response to certain prison situations, including the situation that confronted Lieutenant McKee. Although the defendants argue that Rozzaza was allowed to testify about "legal standards," the only example they recite comes from Rozzaza's testimony explaining his background and qualifications. After Rozzaza mentioned that he had served at a Maryland prison as "Director of Standards and Inspections," plaintiff's counsel asked Rozzaza what was meant by the term "standards." Rozzaza responded, saying:

> Well, a standard is sort of a statement about what a prison should be doing. And—you know—we may have standards, for example, on use of force that the prison will have a written policy and procedure on the use of force.... The standards that I dealt with in Maryland were limited to some degree. We were only allowed to set standards regarding life, health, safety, and constitutional issues. In other words, what is legal.

Defendants fix on the final phrase "what is legal" and attempt to parlay this into a claim that Rozzaza's testimony essentially consisted of improperly telling the jury why the defendants' conduct was illegal. We do not accept this spin on the testimony. It appears clear that Rozzaza used the phrase "what is legal" simply to explain one of the elements of his job as Director of Standards-he helped prisons establish policies in compliance with constitutional law. Rozzaza was not allowed to testify regarding the dictates of deliberate indifference law, nor was it an abuse of the trial court's discretion to admit his testimony.

■ Defendants also challenge the admission of two particular photographs at trial. Because we give special deference to a trial court's evidentiary rulings, the defendants bear a heavy burden in challenging these rulings on appeal. *Grassi*, 63 F.3d at 601. We review the admission of the photographs under an abuse of discretion standard. *Id.* The first challenged photograph is one in a series of 22 pictures taken at the

hospital after the fire, which were introduced to demonstrate the severity and extent of Haley's horrible burns and his treatment.[35] The defendants objected to one of these pictures in particular, claiming that it was cumulative and unduly prejudicial because it showed ankle shackles around the burned legs of the plaintiff. The defendants suggest that the picture was unfairly prejudicial because the jury may have assumed that the defendants shackled Haley and that this was cruel under the circumstances. Thus they argue that the photograph should have been excluded under Rule 403 of the Federal Rules of Evidence. They point to *Lemons v. Skidmore*, 985 F.2d 354, 357 (7th Cir.1993), where we recognized that the presence of handcuffs and leg restraints on a prisoner plaintiff testifying in his § 1983 suit, where his own propensity for dangerousness and violence were "central to the trial of his case," could have unfairly prejudiced the plaintiff, thus denying him a fair trial. *Lemons* has absolutely no application to the case at hand. While it was easy to see the potential prejudice in *Lemons*, it is difficult to imagine any realistic potential for prejudice here. The jury was aware that Haley was a convicted felon who was in prison at the time of the fire, thus explaining the shackles, and his counsel never drew attention to the shackles or implied that the defendants were responsible for their presence. Furthermore, the use of the shackles in the picture did not suggest any cruelty at all, since they appear carefully placed over a gauze-like substance and are not actually touching Haley's skin. The trial court did not abuse its discretion in admitting this photograph.

■ The other challenged photograph is one depicting the severely burned cell 10–35 after the fire was extinguished, which includes the charred body of Kim Wilborn, who died in the fire. The defendants likewise challenge the admission of this photograph under Rule 403, claiming it had "a strong emotional impact" and "minimal probative value." The photograph is certainly chilling, particularly because of the presence of the body. Yet this does not mean that the trial

---

**35.** Haley points out, and the defendants do not deny, that this picture was the only one showing the use of a catheter in Haley's treatment, which was used for hydration.

court should have excluded it. The picture was one of only three taken of the burned cell by arson investigators from the Office of the State Fire Marshall on the night of the fire; they were the only pictures available showing the appearance of the scene of the blaze that night. The arson investigator who testified noted that this particular photograph depicted the scene before it was disturbed in any way for investigation purposes. The picture was highly probative, in that it indicated the severity of the fire and intensity of the damage and showed an area that the other two pictures did not. Unlike the other two photographs of the cell, it also portrayed some of the combustibles that the investigators determined were used to start the fire. In addition, the challenged photograph was specifically used by the testifying arson investigator to show the jury where he believed the fire began. While the photograph is certainly disturbing, its contents were highly relevant; and its very significant probative value was not substantially outweighed by any danger of unfair prejudice. Thus it was properly admitted, and the defendants' challenge is rejected.

## IV.

Finally, the defendants argue that to the extent the district court imposed upon them a greater burden than previously recognized by law, they are shielded from liability by the doctrine of qualified immunity. The Supreme Court held in *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982), that government officials performing discretionary functions are shielded from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court noted that in order for a right to be "clearly established" in this context, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." We

find that while *Farmer v. Brennan,* —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811, further clarified the proper standard for deliberate indifference, it did not change the law in any way that could have affected this case.[36]

The deliberate indifference standard under which the jury reasonably found the defendants liable was well-established at the time of the defendants' conduct. *See Duckworth v. Franzen,* 780 F.2d 645, 652–53 (7th Cir.1985) (finding criminal recklessness to be proper standard for deliberate indifference), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986); *see also Goka v. Bobbitt,* 862 F.2d 646 (7th Cir.1988); *Smith–Bey v. Hospital Adm'r,* 841 F.2d 751 (7th Cir.1988); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In fact, the trial court's jury instructions essentially came from our decision in *Duckworth v. Franzen* and our subsequent restatement of this standard in *McGill v. Duckworth,* 944 F.2d 344, 348–49 (7th Cir.1991) (adopting *Duckworth v. Franzen* subjective knowledge test for deliberate indifference). The defendants admitted during trial that they knew they had a duty to protect inmates from other inmates. They could not have reasonably believed that their indifference to Haley's pleas for help was lawful. We conclude that the defendants were not held to a higher standard of behavior than the existing law at the time.

For the foregoing reasons, the decision of the district court denying the defendants' motion for judgment as a matter of law, as well as their motion for a new trial, is

AFFIRMED.

---

**36.** If anything, *Farmer* made clear that Haley did not have to prove that the defendants intended to harm him, thus making inappropriate defense counsel's repeated suggestion in closing arguments that the defendants were not liable because they did not want or intend Haley to be harmed.