Thomas W. REIMANN, Petitioner,

v.

Matt FRANK, Dan Benik, David Rock, Becky Dressler, Brian Marx, Dawn Koeppen, Gerald Konitzer, Patrick Lynch, Sharon Zunker, John Ray, Dick Verhagen, John Paquin, Ms. Tierney, Catherine Ferrey and Lizzie Tegels, Respondents.

No. 05–C–501–C.

United States District Court,
W.D. Wisconsin.

Oct. 21, 2005.

Thomas W. Reimann, pro se.

Corey F. Finkelmeyer, Assistant Attorney General, Madison, WI, for Defendants.

### ORDER

CRABB, District Judge.

This is a proposed civil action for declaratory, injunctive and monetary relief, brought under 42 U.S.C. § 1983. Petitioner, who is presently confined at the Stanley Correctional Institution in Stanley, Wisconsin, asks for leave to proceed under the *in forma pauperis* statute, 28 U.S.C. § 1915. From the financial affidavit petitioner has given the court, I conclude that petitioner is unable to prepay the full fees and costs of starting this lawsuit. Petitioner has paid the initial partial payment required under § 1915(b)(1).

In addressing any pro se litigant's complaint, the court must read the allegations of the complaint generously. *Haines v. Kerner*, 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). However, if the litigant is a prisoner, the 1996 Prison Litigation Reform Act requires the court to deny leave to proceed if the prisoner has had three or more lawsuits or appeals dismissed for lack of legal merit (except under specific circumstances that do not exist here), or if the prisoner's complaint is legally frivolous, malicious, fails to state a claim upon which relief may be granted or asks for money damages from a defendant who by law cannot be sued for money damages. Ordinarily, this court will not dismiss petitioner's case on its own motion for lack of administrative exhaustion. If respondents believe that petitioner has not exhausted the remedies available to him as required by § 1997e(a) with respect to any of the claims on which he is granted leave to proceed, they may allege his lack of exhaustion as an affirmative defense and argue it on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *Massey v. Helman*, 196 F.3d 727 (7th Cir.1999); *see also Perez v. Wisconsin Dept. of Corrections*, 182 F.3d 532 (7th Cir.1999).

Petitioner attached a number of documents to his complaint. Because I have considered them in analyzing his claims, they have become part of his complaint. Fed.R.Civ.P. 10(c). From the complaint and attached documents, I understand petitioner to be alleging the following.

### ALLEGATIONS OF FACT

#### A. *Parties*

Petitioner Thomas Reimann is an inmate at the Stanley Correctional Institution. Respondent Matt Frank is Secretary of the Wisconsin Department of Corrections. Respondent John Ray is employed by the Department of Corrections as a corrections complaint examiner. Respondent Sharon Zunker is a Regional Director in the Bureau of Health Services, a division of the Department of Corrections. Respondent Dick Verhagen is employed by the department in the Bureau of Correctional Movement. He is responsible for approving transfer decisions and appeals from the Program Review Committee. Respondent Gerald Konitzer is employed as a Regional Director within the Bureau of Correctional Movement.

At the Stanley Correctional Institution, respondent Dan Benik is Warden, respondent David Rock is the nurse practitioner and respondent Becky Dressler is manager of the Health Services Unit, respondents Brian Marx and Dawn Koeppen are inmate complaint examiners and respondent Patrick Lynch is coordinator of the Program Review Committee.

Respondents John Paquin·and Ms. Tierney are Security Directors at the Jackson Correctional Institution in Black River Falls, Wisconsin.

Respondent Catherine Ferrey is Warden and respondent Lizzie Tegels is Deputy Warden and acting Security Director at the New Lisbon Correctional Institution in New Lisbon, Wisconsin.

B. *Petitioner's Medical Conditions*

Petitioner has femoral neuropathy and Hepatitis C and suffers chronic leg and back pain, disc impingement at the L3/4 level, nerve damage in his hand, chronic liver disease, patellofemoral arthritis, joint effusion in both knees and periodic migraine headaches. At some point, he was prescribed psychotropic medication to combat neurological pain and to prevent migraine headaches. In 1991, an orthopaedist directed him to do leg presses and squats. Within six months his leg muscles had been rebuilt and he stopped taking carisoprodol, a muscle relaxant.

C. *Eighth Amendment*

1. *Lack of weight training equipment*

In April 2001, petitioner was transferred from the Jackson Correctional Institution to the Wisconsin Secure Program Facility. The facility does not have a gym or any weight training machines. On June 1, 2001, petitioner filed an inmate complaint requesting weight training for medical reasons. On June 4, 2001, inmate complaint examiner Ellen Ray recommended dismissal of petitioner's complaint, stating that

> Inmate Reimann is currently housed on Alpha Unit, the most restrictive at SMCI, therefore no exercise equipment is provided in the Recreation Cell. He is encouraged to advance through the level system as exercise equipment is provided in the higher levels. In the meantime, Inmate Reimann is encouraged to write HSU and inquire as to what exer-

cises he can do in his cell to continue strengthening his leg.

Respondent Zunker accepted this recommendation and dismissed petitioner's complaint. Petitioner appealed the dismissal of his complaint but respondent John Ray recommended that the appeal be dismissed on the basis of respondent Zunker's review.

2. *Pat searches at New Lisbon Correctional Institution*

While petitioner was at the New Lisbon Correctional Institution (he does not allege when he was transferred from the Wisconsin Secure Program Facility to the New Lisbon Correctional Institution), he was searched by a sergeant before and occasionally after receiving his medication. During the searches, the sergeant looked in petitioner's mouth and touched petitioner's buttocks and either his scrotum or penis. The searches were conducted while other correctional officers armed in full riot gear and other inmates stood nearby. On November 16, 2004, petitioner filed an inmate complaint in which he alleged that the sergeant was fondling him "as some sort of perverse sexual gratification." The inmate complaint examiner who investigated petitioner's complaint spoke to respondents Ferrey and Tegels but did not speak to the sergeant or any eye witnesses. On December 13, 2004, the examiner recommended dismissal of petitioner's complaint, stating that

> In accordance with Administrative Directive 11.6 and Executive Directive 16A, this complaint was immediately brought to the attention of the Warden and Deputy Warden. Because the investigative process is regulated by state law and collective bargaining agreements (which protect the privacy and due process rights of staff) no further information will be given to the inmate. Due to the sensitive nature of this inci-

dent, the complaint has been forwarded to the Warden for further review and action. Consequently, no further action will be taken by this office.

On December 17, 2004, Respondent Ferrey agreed with this recommendation. On December 25, 2004, petitioner appealed the dismissal of his complaint. On January 6, 2005, respondent John Ray recommended dismissal of the appeal, stating that

having discussed this matter with Deputy Warden Tegels at NLCI, and also having been advised that the warden had direct involvement in the process, I am confident the concerns were thoroughly investigated and that the institution response to the claims was consistent with the verified evidence.

Later, petitioner made open records requests to the Juneau County Sheriff's Department, the New Lisbon Police Department and the Department of Corrections. The Juneau County Sheriff's Department advised petitioner that they had not been contacted by the New Lisbon Correctional Institution. On June 29, 2005, the New Lisbon Police Chief wrote to petitioner, saying

The police department did not investigate the incident you describe in your letter, involving staff of the prison in New Lisbon. When incidents occur of this nature, the Warden or designated staff member gives the police department an informal call informing us of such alleged violations and their internal investigation into the matter.

The prison did not request this agency to investigate the alleged incident you speak of. There is no record on file pertaining to this matter.

After hearing this, petitioner filed an inmate complaint on July 2, 2005. On July 26, 2005, the inmate complaint examiner recommended dismissal of the complaint stating that, according to respondent Tegels, the New Lisbon Police Department

had been contacted and an investigation had been initiated on December 2, 2004 and completed on December 10, 2004. On July 29, 2005, respondent Ferrey accepted the recommendation and dismissed the inmate complaint petitioner had filed.

### 3. *Reduction in medications at the Stanley Correctional Institution*

On July 20, 2005, petitioner met with Dr. Rudin, a doctor at the UW Pain Clinic. Dr. Rudin ordered the following treatment plan for petitioner:

1. He should do hamstring stretches, knee extensions, quad stretches, and the PT exercises he learned last year. Work out in the recreation area;

2. Off-shelf arch supports for shoes;

3. Restore Leather restraint restriction for wrists;

4. Medications: If he does the other things listed above, expect you could taper him off methadone within 6 months. Change carisoprodol to noon & HS.

The day after he met with Dr. Rudin, petitioner was summoned to the health services unit at the Stanley Correctional Institution. A nurse, an administrative captain and three or four "blueshirts" met petitioner at the unit. The nurse gave petitioner a "written agreement" allowing respondents Rock or Dressler to summarily discontinue petitioner's methadone and carisoprodol. Petitioner refused to sign the agreement.

On July 22, 2005, respondents Rock and Dressler reduced petitioner's methadone dose 25%, his carisoprodol dose 50% and his hydroxyzine dose 50%. (Petitioner was prescribed hydroxyzine by Dr. Vande Heide, a clinical psychiatrist, who was not informed that respondents Rock and Dressler reduced the dose.) Before reducing his medications, respondent Rock did not examine petitioner and saw him only once.

On July 21, 2005, petitioner filed an inmate complaint concerning respondent Rock's decision to reduce his medication. In his complaint, petitioner stated the following:

> ... On 7/20/05 I saw Dr. Rudin at the UW Pain Clinic who agreed that I have a serious medical need and his recommendation that I remain on all medication for at least 6 months due to the fact I was stabilized and not asking for an increase. After 6 months tapering me off would be discussed after I was done completing a 6 month regiment of exercises he prescribed. On 7/21/05 I was called to HSU @ 2:30 PM and was greeted by 3 blueshirts & a Captain while the nurse demanded I sign an agreement wherein Rock would discontinue ALL medication after 90 days which directly ignored the recommendation of Dr. Rudin....

On July 22, 2005 respondent Koeppen recommended dismissal of the complaint, stating:

> According to the record the inmate is fully informed of the Dr's orders and medication regime in a letter sent to him by D. Rock, NP.
>
> The inmate has full knowledge of his medication changes and will be monitored by HSU through the care and treatment of the inmate.
>
> It is the inmate's primary physician who determines what course of treatment to pursue and in addition, this report is sent to the Bureau of Health Services for review. It is suggested that if the Inmate's condition changes or he has not fully revealed the details he should contact HSU.

On August 1, 2005, Patricia Voermans dismissed petitioner's complaint. Petitioner filed an appeal on August 2, 2005. On August 8, 2005, receipt of petitioner's appeal was acknowledged. The acknowledgment form states that

The Corrections Complaint Examiner (CCE) has 35 working days to submit a recommendation to the Office of the Secretary (OOS) for Review. The OOS has 10 working days to make a decision after receiving the CCE's report.

On July 26, 2005, petitioner awoke around 4:30 a.m. As he moved his legs off the bed he felt a cramp in his left calf. When he tried to put weight on his left leg, pain shot up his leg, causing him to fall forward. The muscle cramping can be fairly attributed to the denial of carisoprodol. Petitioner filed an inmate complaint about the incident but respondent Marx rejected it because it concerned medical issues that should have been directed to the health services unit. Respondent Benik upheld respondent Marx's rejection.

On August 3, 2005, respondent Rock approached petitioner while he was participating in recreation. Petitioner asked respondent Rock why he had not responded to any of the medical request forms petitioner had sent. Respondent Rock told him that he had not received any of them. When petitioner asked respondent Rock why he had reduced petitioner's dose of hydroxyzine, Rock said, "You are really starting to fucking piss me off. Get the fuck out of my face." Petitioner told Rock that there was not much else that he could take away from petitioner because he had denied him all medical care, to which respondent Rock responded, "You'll be fucking surprised."

4. *Denial of indoor recreation at the Stanley Correctional Institution*

Patrice Kennedy of the UW Gastroenterology Clinic has suggested that petitioner work out as often as possible to slow the progression of his chronic liver disease and Hepatitis C. Despite this directive and Dr. Rudin's directive that petitioner work out, respondent Benik implemented a policy on

July 11, 2005, providing that no inmate who receives a "low bunk restriction" is allowed to attend indoor recreation. That same day, petitioner filed a two-page inmate complaint complaining in general terms that the "low bunk restriction" policy was unfair to inmates like himself with physical problems that are alleviated by exercise. Nowhere in the complaint does petitioner suggest that respondents Rock and Dressler were conspiring to keep him from receiving physical therapy. On July 13, 2005, respondent Marx recommended dismissal of the complaint stating,

> Security Director Mr. Miller issued a memo on 7/13/05 directing inmates affected by Warden Benik's memo on lower bunk restrictions to contact HSU to seek permission to participate in indoor recreation. The inmate will have to do this first by submitting a DOC 3035 to HSU.

Respondents Rock and Dressler lied to respondent Marx to get him to recommend dismissal of this complaint. On July 19, 2005, respondent Benik adopted respondent Marx's recommendation and dismissed the complaint. On July 21, 2005, petitioner filed an appeal from the dismissal of the complaint to the Corrections Complaint Examiner. In his appeal petitioner complains,

> Benik's memo alludes to those being on "low bunk restriction" as "contraindicated" for sports such as "basketball & volleyball." I do believe the warden should take the time to get out and actually get the facts: WHY would you stop those on "low bunk restriction" from going to indoor rec when the very sports he refers to are played at OUTSIDE REC? There is no indoor volleyball; there is 1 basketball hoop in use indoors. But yet those on "low bunk restriction" are allowed to attend outside rec to play volleyball, baseball, bocce, horseshoes, etc. If the purpose of the memo was to stop those on "low bunk

restriction" from playing volleyball/basketball he would put them on OUTDOOR REC RESTRICTION!!

> There are several hundred prisoners on "low bunk restriction" at SCI; despite the memo being posted as being effective on 6/28/05 there still hasn't been ANYONE called to HSU to get "reviewed" yet.

> If the purpose of the memo is to weed out teenage basketball players that demand a low bunk for years due to a sprained ankle or other trivial injury why isn't HSU simply reviewing them? The overall effect of the memo has been to deny indoor rec to older prisoners (like myself) that cannot run or play baseball and are on doctor ordered weightlifting. This memo is specifically aimed at prisoners given a medical restriction and the "eighth amendment forbids state to punish people for physical condition as distinct from acts." *Anderson v. Romero*, 72 F.3d 518 ¶ 11 & 12 (7th Cir.1995).

> It would behoove CCE Ray to actually *investigate* the issues for once; nobody has been reviewed by HSU so it's obvious that the memo was posted for no reason but to start a disturbance.

On August 5, 2005, Corrections Complaint Examiner Sandra Hautamaki dismissed petitioner's appeal, stating,

> Based on and in agreement with the report of the Institution Complaint Examiner, it is recommended this complaint be dismissed. I am advised complainant's request to be reviewed has been received by HSU.

On August 8, 2005, Rick Raemisch accepted the decision of the Corrections Complaint Examiner as the decision of the Secretary of the Department of Corrections and dismissed petitioner's complaint.

Respondent Rock refused to approve petitioner for indoor recreation because petitioner has a "low bunk restriction."

Meanwhile, on July 25, 2005, petitioner filed a new inmate complaint complaining about respondent Rock's refusal to give him arch supports, implement a leather cuff restriction and approve petitioner for indoor recreation. Respondent Marx rejected this complaint on the ground that the issues were being addressed "through the inmate's prior use of the ICRS SCI–2005–22612." Respondent Benik upheld the rejection on August 1, 2005.

### 5. *Denial of leather restraints at the Stanley Correctional Institution*

In September 2003, petitioner was seen at the Neurology Consultation Clinic at the University of Wisconsin Hospitals and Clinics. According to a report prepared by Dr. Andrew Waclawik following that visit, petitioner has a history of numbness in his left thumb stemming from a handcuff injury in October 1990. At the time of his injury, petitioner was placed on a plastic handcuff restriction. However, Dr. Waclawik noted that in April 2003, petitioner "ran into issues with a particular law enforcer who did not abide by his plastic handcuff restriction. He relates that he has not truly worn handcuffs when he is in prison but when he goes out, he has not been using the plastic handcuffs." Dr. Waclawik noted that petitioner continues to experience numbness in his left hand and that "placing him on a plastic handcuff restriction is feasible to avoid possible re-injury to the sensory branches of the redial [sic] nerve of the wrist."

Nevertheless, respondent Rock has refused to approve petitioner for leather restraints. On June 3, 2005, petitioner filed an inmate complaint concerning the denial of leather restraints. He stated

I have nerve damage in my hands caused by prolonged use of a "black box" on my hands in an improper manner. As such I have had a valid medical order for "plastic/leather restraints" while being transported to/from UN Hospital. I have had this in effect at GBCI, CCI, WSPF, NLCI and on 04/29/05 it was renewed by JCI Dr. Springs. It is worth noting that I went to UW Neurology Clinic on 9/28/03 and Neurologist Dr. Andrew Waclawik concurred and recommended I again continue with leather restraints so the nerves in my wrist are not re-injured. After arriving at SCI only 3 weeks ago my medical restrictions were updated. When there was nothing about leather restraints I wrote NP Rock at HSU. Now Rock summarily canceled the medical order I have had all these years. It is unrealistic for me to sit in a van for a 4½ hour drive to UW Hospital in a "Black Box" when Rock KNOWS I have nerve damage in my hands caused by a "Black Box" on my wrists. At no time has Rock physically examined me to verify I have nerve damage in my hands. Cancelling a medical order without even examining me while being fully aware I have nerve damage in my hands appears to be an intentional infliction of an injury on me. This ICI will be remedied when my medical restriction is reinstated.

On June 30, 2005, respondent Koeppen recommended dismissal of petitioner's complaint, stating the following:

The Inmate arrived at SCI 3 weeks ago, he states he has used "soft" restraints in other facilities, and is complaining that the order is now "Humane Leather Restraints." The Inmate alleges in his complaint that canceling a medical order appears to be an intentional infliction of injury on the inmate.

According to the Medical Records and the Medical Classification Report of

4/29/05 under Special Needs, it is indicated that the Inmate should use Humane Leather Restraints. In addition, the Inmate wrote a Health Services request regarding plastic or leather restraints and was issued a response on 5/31/05; "You do not qualify for plastic or leather restraints." NP Rock. The special need for a change from "soft" hand restraints was fully evaluated and it was determined that the Inmate does not qualify for "soft" restraints[.] The inmate has been seen in HSU recently and as of 4/29/05 he has a Class III referral to address his pain management issues at UW Pain Clinic. HSU is monitoring the care and treatment needs of the inmate[.]

On 6/30/05 in a discussion with Ms. Dressler, Nursing Supervisor and D. Rock, NP, Inmate does not require a "soft" restraint. In other facilities; JCI, according to the Medical Classification Report, Dr. Springer ordered; "humane leather restraints." According to the Medical Classification Report of 4/1/04 by Dr. Bridgewater, the order specifies: "Cuff per DOC policy." There is no order for "soft" restraints. NP Rock that there is no current contraindication for this Inmate to wear standard cuffs.

It is suggested that if the inmate has concerns over his hand restraints during a long trip, he should address it with the Security staff during the trip for any minor adjustments.

On June 30, 2005, respondent Zunker dismissed the complaint. Petitioner appealed the dismissal, stating that he has had the restriction since 1990 and that he

had no problems until CCI Dr. Bridgwater cancelled the restriction after I contacted Wi Dept of Reg & Licensing about his abuse; even then I was placed in hard plastic restraints during transfer out of CCI and again had the restriction validated at NLCI & JCI.

On July 7, 2005, respondent Ray affirmed the dismissal. On July 20, 2005, Dr. Rudin examined petitioner at the UW Pain Clinic and ordered the leather restraint restriction restored.

6. *Failure to transfer petitioner from the Stanley Correctional Institution to the Jackson Correctional Institution*

On July 28, 2005, petitioner wrote a letter to respondent Lynch requesting a hearing before the Program Review Committee and a transfer back to the Jackson Correctional Institution. In the letter, petitioner told respondent Lynch that respondent Rock was refusing to implement Dr. Rudin's recommendations and that he had reduced petitioner's medications. Also, petitioner wrote about the incident on July 26, 2005 when his leg cramped and he fell down. Respondent Lynch declined to grant petitioner another hearing. He wrote a letter to petitioner stating the following:

Your last PRC sufficiently describes the reasoning behind the decision to transfer you to SCI. Your quarrel with HSU does not involve me, I have explained this to you. I will not address this issue with you again. Thank you.

### D. Retaliation

1. *Transfer from the New Lisbon Correctional Institution to the Jackson Correctional Institution*

In November 2004, respondents Ferrey and Tegels ordered petitioner to be transferred from the New Lisbon Correctional Institution to the Jackson Correctional Institution pursuant to an "emergency security transfer." The transfer occurred three hours after petitioner told a captain at the New Lisbon Correctional Institution that he would be filing a lawsuit against the institution's mailroom staff because they failed to deliver a magazine to him.

Also, the transfer occurred less than 24 hours after Scott Schaffer, a former inmate, "returned a visiting form." The motive behind petitioner's transfer was related to the fact that Schaffer had been sent to the Wisconsin Secure Program Facility in 2001 for having a consensual sexual relationship with Amy Morales, a sergeant at the Jackson Correctional Institution. Morales was uncomfortable about Schaffer's having visits with petitioner.

2. *Transfer from the Jackson Correctional Institution to the Stanley Correctional Institution*

While on the Neillsville unit at the Jackson Correctional Institution, petitioner filed dozens of inmate complaints complaining that Melinda Derus, the unit manager, had refused to allow him to enroll in the Level 5 AODA program. In addition, petitioner provided legal assistance to other inmates pursuing claims against Derus because she denied them entry into the AODA program.

On May 10, 2005, petitioner was told that he would have an emergency Program Review Committee hearing the next day and that he could be transferred for "security reasons." At the hearing, Shannone Manz, the registrar at the Jackson Correctional Institution, told petitioner that there were no documents available to substantiate the security concerns. Petitioner alleges that, after the hearing, Derus told him:

> [I]t wasn't bad enough all the complaints you filed, but you typed them for Hoover and now even Moran. I know you typed that letter for Holden about us denying him a program and now you are going to help Hoover and try to put me in jail for contempt of court because he didn't like the way I processed that court order. I also heard about filing a Notice of Claim on me. If this was the way it used to be we could have just hooked you up and that would have been

the end of it. But no, this new warden treats you too good; it was better back when Karlin & Berz were here because they didn't pamper you guys and we could do what we wanted. Now we get suspended for it. You're going to SCI and nothing you can do about it. File so many complaints there and Miller will deal with you like he did before.

Petitioner's transfer from the Jackson Correctional Institution to the Stanley Correctional Institution was arranged pursuant to a "security arrangement" between the security directors of the two institutions, including respondents Paquin and Tierney.

On May 11, 2005, petitioner submitted a document entitled "Request for Review of Assessment and Evaluation or Program Review Action" to respondent Konitzer in which he argued that the "security concerns" were fabricated by respondents Paquin and Tierney to disguise a retaliatory motive. Respondent Konitzer denied the appeal, stating that there was no evidence of impropriety in the transfer and that listing "security concerns" as the basis for the transfer was acceptable.

On May 18, 2005, petitioner filed another appeal of the Program Review Committee's decision to transfer him with respondent Verhagen. He argued that his transfer was intended to prevent an investigator with the United States Department of Justice from interviewing him about corruption and misappropriation of millions of dollars within the prison system. Nowhere in this appeal does petitioner suggest that his transfer was arranged by respondents Paquin and Tierney because of his complaints about Derus. Respondent Verhagen denied petitioner's appeal on June 30, 2005.

After arriving at the Stanley Correctional Institution, petitioner filed an inmate complaint, stating that he had been trans-

ferred in retaliation for filing inmate complaints and for reading a letter on May 9, 2005 from an inmate at the New Lisbon Correctional Institution in which the inmate stated that he had just been interviewed in connection with an investigation into misconduct within the Department of Corrections. On May 23, 2005, respondent Marx rejected the complaint "because decisions made by the program review committee are not appealable through the inmate complaint review system." Respondent Benik affirmed rejection of the complaint, stating that Jackson Correctional Institution staff had not made the decision to transfer petitioner.

### 3. Complaint against Dr. Bridgewater

While incarcerated at the Columbia Correctional Institution in 2004, petitioner filed numerous complaints and a formal grievance against Dr. Gary Bridgewater. On the one occasion that petitioner spoke to respondent Rock at the Stanley Correctional Institution, respondent Rock alluded to petitioner's grievance and told petitioner that Dr. Bridgewater was his "close personal friend."

On July 21, 2005, petitioner filed an inmate complaint alleging that respondent Rock denied him medication in retaliation for petitioner's having filed a grievance with the Wisconsin Department of Regulation & Licensing against Dr. Bridgewater. In the complaint, petitioner stated

On July 20, 2005 Dr. Nathan Rudin made the following orders while acting within his official capacity as a Pain Management Specialist:

4) Medications: If he does the other things listed above, expect you could taper him off methadone within 6 months. Change carisoprodol to noon & HS;

Instead of complying with these directions Rock maliciously reduced my carisoprodol to 1 tablet daily and also reduced my hydroxyzine to 50 mg TID instead of 100 mg TID.

Hydroxyzine is prescribed by Dr. VandeHeide and has nothing to do with any type of treatment plan. Rock is a glorified nurse; VandeHeide is a licensed MD treating me for mental problems. I am extremely anxious after Rock took it upon himself to summarily take my medication in direct contravention of UW Pain Clinic orders. What does a clinical med have to do with Rock's alleged treatment plan? Absolutely nothing. In addition, since I haven't been able to do "the other things" e.g. leg extensions, arch supports and weight training for my legs there hasn't been any opportunity for me to rebuild strength in my legs muscles that would lessen the need for pain medication. Rock has never done even the most cursory physical examination of me. He spoke to me for about 5 minutes on one instance and that is the extent of my interactions with him. This ICI will be remedied when my hydroxyzine is increased to the former 100 mg TID and carisoprodol is likewise returned to what was prescribed by Dr. Rudin. This medication theft was apparently motivated because I filed a complaint to WI Regulation/Licensing against Rock's bosom buddy Dr. Gary Bridgwater at CCI.

On July 21, 2005, respondent Marx returned petitioner's inmate complaint to him

because of failure to meet the filing requirements as stated in DOC 310, Wis. Adm. Code:

Complaints shall not contain language that is obscene, profane, abusive, or threatens others, unless such language is necessary to describe the factual basis of the substance of the complaint [DOC 310.09(1)(c) ].

Petitioner crossed out the phrase "bosom buddy" and resubmitted the complaint. On July 28, 2005, respondent Marx rejected the complaint, stating

> The issue raised in this complaint has been addressed through the inmate's prior use of the ICRS (DOC 310.11(5)(g), Wis. Adm.Code). The Inmate's issues related to medications changes has been addressed in complaint SCI 2005–22612. This complaint includes two additional medication changes; carisoprodol and hydroxyzine, that are not identified in the previous complaint; however, the Inmate has been sent a letter informing him of all medication changes identified in both complaints. The Inmate should contact HSU for any further concerns.

Petitioner filed an appeal of the rejection of his complaint in which he stated that

> N.P. Rock is not empowered to discontinue medication I am prescribed by Clinical Services. Nor did Dr. Rudin at the Pain Clinic say anything about taking away my Carisoprodol. As Warden Benik is aware, I HAVE written Becky Dressler several times AND submitted several DOC–3035 forms requesting to be seen at HSU and as usual they were ALL ignored. It is pointless filing these appeals since Benik rubberstamps each/every lie propounded by the SCI ICE to reject complaints.

### E. *Due Process*

Respondent Ray has a policy of refusing to investigate any appeal that was decided by a Bureau of Health Services employee. Respondent Verhagen has implemented a policy of denying the overwhelming majority of appeals from Program Review Committee decisions. Respondent Marx has a de facto policy of rejecting most inmate complaints for a variety of reasons. Respondent Benik affirms all rejections and there is no review by a corrections complaint examiner.

The inmate complaint examiner at the Stanley Correctional Institution has failed to comply with any of the stated objectives of the inmate complaint review system as set out in Wis. Admin. Code § DOC 310.01. The inmate complaint examiner ignores the facts and summarily rejects the overwhelming majority of complaints. As part of the orientation process for incoming inmates, the inmate complaint examiner has admitted that the overwhelming majority of inmate complaints are rejected. Respondent Benik affirms every rejection summarily. No meaningful investigation or review of inmate grievances occurs.

Respondent Ray, the corrections complaint examiner, is a former property sergeant at a correctional institution. Therefore, he dismisses all appeals in favor of the department consistently. Respondent Benik has never responded to any of the memos petitioner has sent him regarding respondents Rock and Dressler depriving him of medical care. Because the respondents in charge of the inmate complaint review system at the Stanley Correctional Institution do not provide meaningful review of inmate grievances, petitioner is left with no choice but to seek judicial redress.

On August 3, 2005, petitioner filed an inmate complaint concerning the inmate complaint examiner's misuse of the inmate complaint review system to make it impossible for inmates to secure any relief for their grievances short of filing lawsuits. Inmate complaint examiner Tom Gozinske rejected the complaint on August 5, stating that the complaint amounted to "an appeal of previously rejected complaints and, as such, is not properly raised in" the inmate complaint review process.

## DISCUSSION

### A. *Eighth Amendment*

#### 1. *Lack of weight training equipment*

I understand petitioner to allege that respondents Zunker and John Ray violated his rights under the Eighth Amendment by dismissing his inmate complaint in which he requested access to weight training equipment while he was incarcerated in the Alpha unit at the Wisconsin Secure Program Facility. He alleges that he suffers from femoral neuropathy and several other leg ailments, that an orthopaedist told him to do leg presses and leg squats in 1991 and that he rebuilt his leg muscles after doing these exercises for six months. However, from 2001–2004, while petitioner was incarcerated at the Wisconsin Secure Program Facility, he lacked access to exercise equipment needed to keep his leg muscles from atrophying.

■ To state a claim under the Eighth Amendment, an inmate must allege the existence of an objectively serious injury to which prison officials were deliberately indifferent. *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir.2001). With respect to exercise, the Court of Appeals for the Seventh Circuit has stated that denial of exercise may constitute a constitutional violation "in extreme and prolonged situations where movement is denied to the point that the inmate's health is threatened." *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir.1996) (viable claim stated where inmate not allowed recreation for seven consecutive weeks); *see also Delaney v. DeTella*, 256 F.3d 679 (7th Cir.2001) (denying qualified immunity to prison official who denied inmate in segregation all out-of-cell exercise for six months); *Jamison–Bey v. Thieret*, 867 F.2d 1046, 1046–47 (7th Cir.1989) (reversing summary judgment for prisoner who was in segregation for 101 days and denied exercise five times a week); *but see Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir.1997) (denial of outdoor exercise for seventy days permissible). Petitioner alleges that he was incarcerated at the Wisconsin Secure Program Facility from 2001–2004 but does not indicate how long he was denied access to exercise equipment. However, he does allege that his leg muscles atrophied and that he developed arthritis. At this stage of the proceedings, petitioner's allegations are sufficient to suggest the existence of an objectively serious medical condition.

■ The next question is whether petitioner has alleged that respondents Zunker and Ray were deliberately indifferent to his condition. Deliberate indifference is the equivalent of intentional or reckless conduct. *Jackson v. Illinois Medi–Car, Inc.*, 300 F.3d 760, 765 (7th Cir.2002). At a minimum, it requires that a prison official "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that he actually draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Allegations of inadvertent error, negligence, gross negligence or even ordinary malpractice do not equal deliberate indifference. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir.1996). In this case, petitioner alleges that he filed an inmate complaint and that inmate complaint examiner Ellen Ray recommended dismissal of the complaint because the Secure Program Facility does not have exercise equipment available for use by inmates housed in the lower levels of the facility. In addition, she suggested that petitioner consult the health services unit to determine what exercises he could do in his cell to maintain his leg strength. Petitioner's allegations indicate that respondent Zunker agreed with Ellen Ray's recommendation and that respondent John Ray recommended dismissal of petitioner's appeal because petitioner's complaint had

been reviewed and decided by respondent Zunker, who works in the Bureau of Health Services. Petitioner does not allege that respondent Zunker knew about the severity of his leg ailments and disregarded the threats to his health that might follow from not having access to exercise equipment. Therefore, he has not alleged that respondent Zunker acted or failed to act with deliberate indifference. As for respondent John Ray, his deference to respondent Zunker cannot be equated with deliberate indifference. *Greeno v. Daley,* 414 F.3d 645, 655–56 (7th Cir.2005) (corrections complaint examiner not deliberately indifferent for failing to investigate or remedy inappropriate treatment). Because petitioner's allegations are insufficient to state a claim, he will be denied leave to proceed on this claim.

2. *Pat searches at New Lisbon Correctional Institution*

██ I understand petitioner to allege that his rights under the Eighth Amendment were violated when he was subjected to sexually abusive pat searches by a sergeant at the New Lisbon Correctional Institution before and after he received his medication. He alleges further that respondents John Ray, Ferrey and Tegels participated in the violation, either by failing to "adequately investigate" petitioner's inmate complaint regarding the pat searches or by failing to contact the New Lisbon Police Department to request a criminal investigation into his allegation of sexual abuse.

"In the context of bodily searches performed upon those incarcerated in our prison system, only those searches that are maliciously motivated, unrelated to institutional security, and hence totally without penological justification are considered unconstitutional." *Whitman v. Nesic,* 368 F.3d 931, 934 (7th Cir.2004) (citations and quotations omitted). Petitioner alleges that the pat searches lacked any justifica-

tion but he has not sued the sergeant who conducted them. Instead, he has sued respondents Ferrey and Tegels, the Warden and Deputy Warden at the New Lisbon Correctional Institution, and respondent John Ray, a corrections complaint examiner. Although these officials were not personally involved in the allegedly unconstitutional searches, they may still be liable under § 1983 because a prison official need not participate directly in a constitutional violation for liability to attach. *Smith v. Rowe,* 761 F.2d 360, 369 (7th Cir.1985). An official may be held liable if he knew about the violation and facilitated it, approved it, condoned it or turned a blind eye for fear of what he might see. *Morfin v. City of East Chicago,* 349 F.3d 989, 1001 (7th Cir.2003).

Petitioner's allegations are not sufficient to state an Eighth Amendment claim against respondents Ferrey and Tegels. He alleges that he filed an inmate complaint concerning the searches on November 16, 2004. On December 13, 2004, an inmate complaint examiner recommended dismissal of the complaint, noting that petitioner's allegation had been forwarded to respondents Ferrey and Tegels and that petitioner would not be given any further information because the investigation was regulated by state law and collective bargaining agreements that protect staff privacy. He alleges further that he wrote to the Juneau County Sheriff's Department and the New Lisbon Police Department asking for records concerning any investigation they conducted into petitioner's allegations. He learned later that the Juneau County Police Department had not been contacted by the New Lisbon Correctional Institution and that the institution had not asked the New Lisbon Police Department to investigate petitioner's allegations. After learning this, petitioner filed another inmate complaint that an inmate complaint examiner recommended dismiss-

ing after noting that, according to respondent Tegels, the New Lisbon Police Department had been contacted and that an investigation had been conducted from December 2 to 10, 2004.

Petitioner appears to believe that respondents Ferrey and Tegels may have lied about contacting the New Lisbon Police Department. But the discrepancy between what respondent Tegels told the inmate complaint examiner and what petitioner learned directly from the New Lisbon Police Department does not allow an inference to be drawn that respondents Ferrey and Tegels were deliberately indifferent to his concerns. Petitioner has not alleged that he was searched by the sergeant or had any other contact with him after he filed his inmate complaint concerning the searches. Moreover, petitioner was informed specifically that he would not be given any further information regarding the investigation of his allegation. The fact that petitioner did not allege that the searches continued after he filed his inmate complaint suggests that respondents Ferrey and Tegels investigated his concerns and took appropriate action.

■ In addition, petitioner's allegations are insufficient to state a claim against respondent Ray. Petitioner alleges that respondent Ray recommended dismissal of an inmate complaint filed by petitioner concerning the searches. In recommending dismissal of the complaint, respondent Ray stated that he had spoken with respondent Tegels, who had informed him that respondent Ferrey was taking steps to investigate petitioner's allegations. Clearly, respondent Ray did not ignore petitioner's concerns; rather, he asked and learned from appropriate officials at New Lisbon that an investigation was being conducted. His failure to do anything more does not constitute deliberate indifference. *Greeno,* 414 F.3d at 656. There-

fore, petitioner will not be granted leave to proceed on this claim.

3. *Reduction of prescribed medications at the Stanley Correctional Institution*

■ I understand petitioner to allege that, while he was confined at the Stanley Correctional Institution, respondents Rock and Dressler violated his rights under the Eighth Amendment by reducing his medications. In addition, I understand him to allege that respondent Koeppen participated in this violation by recommending dismissal of one of his inmate complaints concerning his medications.

Petitioner will be denied leave to proceed on this claim because the documents he has attached to his complaint indicate that he has failed to exhaust his administrative remedies with respect to this claim. Ordinarily, this court would not dismiss a petitioner's claim on its own motion for lack of administrative exhaustion but instead would wait for respondents to raise failure to exhaust as an affirmative defense. *Massey v. Helman,* 196 F.3d 727 (7th Cir.1999) (administrative exhaustion not jurisdictional threshold); *see also Perez v. Wisconsin Dept. of Corrections,* 182 F.3d 532 (7th Cir.1999). However, the Court of Appeals for the Seventh Circuit has held that courts have discretion to raise affirmative defenses on their own. *Gleash v. Yuswak,* 308 F.3d 758, 760–61 (7th Cir.2002). In *Walker v. Thompson,* 288 F.3d 1005, 1009–10 (7th Cir.2002), the court held that a court may dismiss a claim if it is plain from the face of the complaint that the plaintiff failed to exhaust his administrative remedies.

Under the Prison Litigation Reform Act, prisoners must "exhaust 'such administrative remedies as are available' *before* bringing a lawsuit . . . ." *Massey,* 196 F.3d at 733 (citing 42 U.S.C. § 1997e) (emphasis added). For the purpose of § 1997e, a

complaint is "brought" when it is tendered to the district clerk. *Ford v. Johnson*, 362 F.3d 395, 399 (7th Cir.2004). Petitioner tendered his complaint to the clerk of this court for filing on August 15, 2005. However, his appeal of the dismissal of his inmate complaint regarding the reduction in his medications was still unresolved at that time. On August 8, 2005, a week before he tendered his complaint to the clerk of this court, an acknowledgment was issued to petitioner indicating that his appeal had been received. The acknowledgment indicated further that the corrections complaint examiner had "35 working days to submit a recommendation to the Office of the Secretary," which had "10 working days to make a decision after receiving the CCE's report." Because this process had not been completed before petitioner filed his complaint in this court, he did not exhaust his administrative remedies with respect to this claim. Petitioner will be denied leave to proceed on this claim.

### 4. *Denial of access to indoor recreation at the Stanley Correctional Institution*

 I understand petitioner to allege that respondent Benik violated his Eighth Amendment rights by implementing a "low bunk restriction;" that respondent Rock participated in this violation by not allowing petitioner to take part in indoor recreation following implementation of the restriction; that respondents Rock and Dressler conspired to keep him from receiving the physical therapy he required by lying to respondent Marx in order to get him to recommend dismissal of petitioner's inmate complaint about the low bunk restriction; and that respondent Marx denied petitioner his right to medical care by recommending dismissal of his inmate complaint.

Petitioner's claim that respondent Benik violated his Eighth Amendment rights by implementing a low bunk restriction is without legal merit. Nothing in petition-

er's allegations suggest that respondent Benik intended the restriction to apply in such a way as to deprive persons in medical need of therapeutic physical exercise of all opportunity to obtain such exercise. Indeed, it appears from petitioner's complaint that prison administrators insured that inmates were aware that individuals requiring medical exemptions from the restrictions could seek an exemption from the health services unit. Accordingly, I will deny petitioner leave to proceed against respondent Benik on this claim.

Also, petitioner's request for leave to proceed will be denied with respect to his claim that respondent Rock was deliberately indifferent to his serious medical need for therapeutic physical exercise when he refused to grant petitioner an exception to the "low bunk restriction," because it is clear that petitioner did not exhaust his administrative remedies with respect to this claim. Petitioner's inmate complaint regarding the low bunk restriction was filed on July 11, 2005, the same day that the low bunk restriction was issued. In his complaint, petitioner challenges the restriction as ill-designed to achieve its purpose of preventing misuse of low bunk assignments. Nothing in his complaint suggests that he had attempted to obtain an exemption from the restriction from respondent Rock and had been refused it. Indeed, the documents petitioner submitted reveal that the deputy warden did not issue the memorandum advising inmates affected by the restriction that they could seek an exception to the restriction by visiting the health services unit until two days after petitioner filed his inmate complaint. Petitioner's appeal to the corrections complaint examiner reveals that as of July 21, 2005, petitioner remained unhappy about the restriction in part because he had not yet been seen by the health services unit. Finally, the decision of the corrections complaint examiner

on August 5, 2005, notes that her investigation revealed that petitioner's request to be reviewed by the health services unit had been received and was pending. Ten days later, on August 15, 2005, petitioner tendered his complaint to the clerk of this court for filing. It is not possible for him to have obtained the health services review necessary for an exemption from the low bunk restriction, have been denied the exception by respondent Rock, and have grieved Rock's denial through the inmate complaint grievance system before he filed his complaint here.

Likewise, it is highly unlikely that petitioner exhausted his administrative remedies before he filed his lawsuit in this court on his claim that respondents Rock and Dressler conspired to influence respondent Marx's July 19, 2005 recommendation to dismiss his inmate complaint about the low bunk restriction. Petitioner makes no mention of such a conspiracy in his complaint about the low bunk restriction policy or his appeal to the corrections complaint examiner from Marx's recommendation for dismissal. Moreover, although petitioner took great pains to index the inmate complaints he filed in connection with the claims raised in this lawsuit, the index does not include a reference to any complaint he may have filed after July 19 to grieve respondent Rock's and Dressler's alleged conspiracy.

██ In any event, petitioner's conspiracy claim must be dismissed for lack of legal merit. Claims of conspiracies to effect deprivations of civil or constitutional rights may be brought in federal court under § 1983. Here, however, petitioner's conspiracy claim is not tied to the deprivation of a constitutional right. Instead, petitioner alleges that respondents Rock and Dressler conspired to lie to respondent Marx so that Marx would recommend dismissal of his inmate complaint. Petitioner does not have a constitutional right to a

positive response to his inmate complaint. Therefore, the alleged conspiracy is not actionable under § 1983.

██ Finally, petitioner does not state a separate claim of constitutional wrongdoing against respondent Marx. As noted above, petitioner does not have a constitutional right to a favorable outcome on his inmate complaints. Nor has petitioner alleged any facts from which an inference may be drawn that respondent Marx was being deliberately indifferent to petitioner's need for physical exercise when he denied petitioner's inmate complaint. Instead, it appears that his investigation revealed that petitioner could have his exercise needs met through the health services unit.

Because his allegations fail to state a claim, petitioner will be denied leave to proceed with respect to his claim of denial of access to indoor recreation.

5. *Denial of leather restraints at the Stanley Correctional Institution*

I understand petitioner to allege that respondent Rock is violating his rights under the Eighth Amendment by refusing his requests that leather restraints be used on his wrists when he is transported outside the prison and that respondents Koeppen, Zunker and Ray are participating in this violation by dismissing his inmate complaints concerning this issue. From his inmate complaint on this issue and the written report prepared by Dr. Andrew Waclawik dated September 28, 2003, it appears that petitioner is suffering nerve damage in his hands and wrists and that, many years ago, in 1990, he was placed on a soft restraint restriction. In his April 2003 report, Dr. Waclawik, a physician at the UW Neurology Consultation Clinic, confirmed that "placing [petitioner] on a plastic handcuff restriction is feasible to avoid possible re-injury" to his wrists. In

July 2005, Dr. Rudin, a physician at the UW Pain Clinic, recommended that the leather restraint restriction be restored. Nevertheless, respondent Rock has refused to make a medical determination that petitioner requires soft restraints.

As noted above, an inmate states a claim under the Eighth Amendment when he alleges that a prison official acted or failed to act in deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Court of Appeals for the Seventh Circuit has held that the phrase "serious medical needs" encompasses not only conditions that are life-threatening or that carry risks of permanent, serious impairment if left untreated, but also those in which the deliberately indifferent withholding of medical care results in needless pain and suffering. *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir.1997). Petitioner has alleged sufficient facts to suggest that he has a serious medical condition, that is, nerve damage in his wrists, which causes him pain when he is placed in traditional metal handcuffs.

■ Deliberate indifference to pain, easily ameliorated, is evidenced by a prison official's actual intent or reckless disregard. Reckless disregard "is characterized by highly unreasonable conduct or a gross departure from ordinary care in a situation in which a high degree of danger is apparent." *Benson v. Cady*, 761 F.2d 335, 339 (7th Cir.1985). Courts must "examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Gutierrez*, 111 F.3d at 1375. Inadvertent error, negligence, gross negligence or even ordinary malpractice are insufficient grounds for invoking the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir.1996). However, "a prisoner claiming deliberate indifference need not prove that the prison officials intended, hoped for, or desired the harm that transpired." *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir.1996). It is enough if the official actually knew of a substantial risk of harm to the inmate and acted or failed to act in disregard of that risk. *Id.* "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

■ Petitioner's allegations suggest that his need for soft restraints has been evaluated at several points during his incarceration and that at present, respondent Rock has decided that petitioner can handle metal handcuffs despite the contrary opinions of a doctor who appears to specialize in neurology and a doctor who appears to specialize pain management. Petitioner appears to believe that respondent Rock is obliged to follow the recommendations of Drs. Waclawik and Rudin because they are doctors and respondent Rock is a nurse practitioner. However, this is not the case. Nurse practitioners have the training to diagnose and manage many common and chronic illnesses and to prescribe medications. AMERICAN MEDICAL ASSOCIATION, COMPLETE MEDICAL ENCYCLOPEDIA 909 (2003) (nurse practitioner is "advanced practice nurse specially trained for a role in primary care"). The American College of Nurse Practitioners defines a nurse practitioner as

.a registered nurse with advanced academic and clinical experience, which enables him or her to diagnose and manage most common and many chronic illnesses, either independently or as part of a health care team. A nurse practitioner provides some care previously offered only by physicians and in most states has the ability to prescribe medications. Working in collaboration

with a physician, a nurse practitioner provides high-quality, cost-effective and individualized care for the lifespan of patient's special needs.

American Collection of Nurse Practitioners, *What is a Nurse Practitioner?*, at http://www.nurse.org/acnp/facts/wha-tis.html. Because nurse practitioners are akin to licensed physicians in their ability to diagnose and manage illnesses, respondent Rock's decision not to implement a soft restraint restriction cannot be understood as a refusal to implement a doctor's orders. Rather, the decision may be nothing more than a difference of opinion about petitioner's condition. "Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir.1996).

Nevertheless, at this early stage, I must construe petitioner's allegations liberally. It is possible that petitioner will be able to show that respondent Rock's decision to refuse to implement a soft restraint restriction is not based on any medical consideration, but simply to cause petitioner pain when he is moved. Therefore, I will grant petitioner's request for leave to proceed against respondent Rock on this claim. However, petitioner will be denied leave to proceed against respondents Koeppen, Zunker and Ray, the individuals who reviewed his inmate complaints. Respondent Koeppen, the inmate complaint examiner who recommended dismissal of petitioner's inmate complaint, relied on respondent Rock's statements that petitioner did not qualify for a soft restraint restriction. Respondent Zunker dismissed the complaint and respondent Ray affirmed the dismissal. Because these individuals relied on the statements of the medical official directly responsible for petitioner's care at the Stanley Correctional Institution, their dismissal of his inmate complaint is not the equivalent of deliberate indifference. *Greeno*, 414 F.3d at 655–56.

6. *Failure to transfer*

■ I understand petitioner to allege that respondent Lynch violated his rights under the Eighth Amendment by denying his request for a transfer out of the Stanley Correctional Institution. Petitioner's allegations of fact do not raise a cognizable claim under the Constitution. First, with respect to the Eighth Amendment, petitioner has not alleged facts from which an inference can be drawn that the conditions of his confinement at the Stanley Correctional Institution are so deplorable and inhumane that his transfer is the only way to relieve him from cruel and unusual punishment.

■ Second, to the extent petitioner may be asserting a due process claim grounded in respondent's Lynch failure to transfer him, his allegations fail to state a claim. The decision to transfer or not to transfer an inmate from one prison to another does not implicate a liberty interest protected by the Fourteenth Amendment of the United States Constitution. *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). "Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular state." *Olim v. Wakinekona*, 461 U.S. 238, 245, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Bruscino v. Carlson*, 854 F.2d 162, 167 (7th Cir.1988). Therefore, petitioner will be denied leave to proceed on this claim.

### B. *Retaliation*

1. *Transfer from New Lisbon Correctional Institution to Jackson Correctional Institution*

■ I understand petitioner to be alleging that respondents Ferrey and Tegels

ordered him transferred from the New Lisbon Correctional Institution to the Jackson Correctional Institution in November 2004 in order to retaliate against him for telling another prison official at New Lisbon that he intended to file a lawsuit and for being friends with a former inmate who wanted to visit petitioner and who had had a sexual relationship with a sergeant at the Jackson Correctional Institution.

Otherwise lawful action "taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter,* 224 F.3d 607, 618 (7th Cir.2000); *see also Zimmerman v. Tribble,* 226 F.3d 568, 573 (7th Cir.2000) ("otherwise permissible conduct can become impermissible when done for retaliatory reasons"). To state a claim for retaliation, a prisoner need not allege a chronology of events from which retaliation could be plausibly inferred. *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir.2002). However, he must allege sufficient facts to put the defendants on notice of the claim so that they can file an answer. *Id.* In the context of a retaliation claim, a prisoner must identify the allegedly retaliatory act as well as the constitutionally protected right he exercised. *Id.*

Petitioner's allegation that he was transferred after former inmate Schaffer returned a visitor's form will not support a retaliation claim because this motive is unrelated to petitioner's exercise of his constitutional rights. However, he has alleged also that he was transferred three hours after informing a captain of his intent to file a lawsuit because mailroom staff had not delivered a magazine to him. Prisoners have a constitutional right to file nonfrivolous lawsuits and to complain about prison conditions. Although petitioner faces an uphill battle to prove the existence of a causal relationship between petitioner's notifying the captain that he

intended to file a lawsuit and his transfer, his allegations are sufficient at this early stage to state a claim of retaliation and he will be granted leave to proceed on this claim against respondents Ferrey and Tegels.

### 2. *Transfer from the Jackson Correctional Institution to the Stanley Correctional Institution*

█ I understand petitioner to allege that respondents Paquin and Tierney arranged for his transfer from the Jackson Correctional Institution to the Stanley Correctional Institution in retaliation for his having filed many inmate complaints about Melinda Derus, a unit manager at Jackson. Although petitioner does not allege how respondents Paquin and Tierney would have any reason to know about his complaints about unit manager Derus, his allegations are sufficient at this early stage to state a claim of retaliation against them.

█ However, petitioner's allegations are not sufficient to allege the personal involvement of respondents Konitzer, Verhagen, Marx or Benik. Petitioner alleges that he argued to respondent Konitzer that respondents Paquin and Tierney made up non-existent security reasons to justify the transfer. His allegations show that respondent Konitzer investigated his contention and found it to be without merit. Because respondent Konitzer did not turned a blind eye to petitioner's concerns, he cannot be said to have been personally involved in the allegedly retaliatory transfer. *Greeno,* 414 F.3d at 655–56. Similarly, petitioner has not alleged sufficient personal involvement with respect to respondent Verhagen. In his appeal to respondent Verhagen, petitioner did not tell him about respondents Paquin and Tierney's allegedly retaliatory motive.

Petitioner alleges that after he was transferred to the Stanley Correctional In-

stitution, he filed an inmate complaint that was rejected by respondent Marx, an inmate complaint examiner, and respondent Benik, the warden, because the complaint concerned matters outside the scope of the inmate complaint review system. This allegation is insufficient to suggest that either of these respondents harbored a retaliatory motive towards petitioner or that they were involved in the decision to transfer him.

### 3. *Complaint against Dr. Bridgewater*

I understand petitioner to allege that respondent Rock denied him medication in retaliation for petitioner's having filed a formal grievance against Dr. Bridgewater with the Wisconsin Department of Registration & Licensing in 2004. Petitioner alleges that he filed the grievance while he was incarcerated at the Columbia Correctional Institution. After he was transferred to the Jackson Correctional Institution, petitioner alleges that respondent Rock told him that Dr. Bridgewater was a "close personal friend."

Petitioner will be denied leave to proceed on this claim because it is clear that he failed to exhaust his administrative remedies. His allegations indicate that he filed an inmate complaint on July 21, 2005 in which he complained about respondent Rock's reduction of his dosages of carisoprodol and hydroxyzine. He complained also about respondent Rock's failure to examine him and about his inability to do exercises to strengthen his leg muscles. At the end of his complaint, petitioner included the following sentence: "This medication theft was apparently motivated because I filed a complaint to WI Regulation/Licensing against Rock's bosom buddy Dr. Gary Bridgwater at CCI." Respondent Marx rejected petitioner's complaint on the ground that it contained abusive, profane or threatening language. After petitioner resubmitted the complaint, respondent Marx rejected it on the ground that

petitioner had previously filed inmate complaints concerning the reductions in his medications. Respondent Marx did not mention petitioner's one-line contention that his medications had been reduced in retaliation for his having filed a complaint against Dr. Bridgewater.

The point of the exhaustion requirement is to allow prison officials the first chance to remedy the problems about which an inmate complains so that the need for federal litigation may be avoided. retaliation claim. *Perez*, 182 F.3d at 535. In this case, petitioner's inmate complaint focused heavily on his concerns that respondent Rock had reduced his medications and included only one sentence at the end suggesting that the motive for the reduction might be retaliatory. After petitioner's complaint was rejected for abusive language and he filed a toned down version, respondent Marx identified the issue raised in the complaint as a complaint about medication reduction and rejected it a second time on the ground that those concerns were being addressed in a separate inmate complaint. Had petitioner's true complaint been that respondent Rock was engaging in retaliatory behavior for petitioner's exercise of his right to file a complaint about Dr. Bridgewater, at the least he should have challenged the rejection on the ground that respondent Marx was wrong to view the complaint as being about a reduction in medications. Petitioner did not do that. Because he did not set out his retaliation claim against respondent Rock in an inmate complaint in a manner that allowed prison officials to understand that his complaint was about a retaliatory act designed to chill his ability to grieve rather than about reduced medications, that he has failed to exhaust his administrative remedies with respect to this claim.

### C. *Due Process*

▮ Petitioner makes several conclusory allegations concerning his inability to resolve his grievances through the inmate complaint review system. Specifically, he alleges that (1) respondent Ray has a policy of refusing to investigate any appeal of the dismissal of an inmate complaint that was investigated by an employee of the Bureau of Health Services; (2) respondent Verhagen has a policy of denying a majority of appeals from Program Review Committee decisions without any meaningful review; (3) respondent Marx has a policy of rejecting most inmate complaints and respondent Benik affirms all rejections without any meaningful review; and (4) the inmate complaint review system, as it operates at the Stanley Correctional Institution, fails to comply with its purposes as set out in Wis. Admin. Code § DOC 310.01. I understand petitioner to allege that these deficiencies deny him due process of law.

It is obvious that petitioner is frustrated by his inability to have his concerns resolved in his favor within the prison system. However, before petitioner is entitled to Fourteenth Amendment due process protections, he must first have a protected liberty or property interest at stake. *Averhart v. Tutsie*, 618 F.2d 479, 480 (7th Cir.1980). In the prison setting, liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (citations omitted).

Petitioner's allegations do not suggest that he was deprived of a liberty or property interest. The due process clause does not require states to provide meaningful review of prisoner complaints. Petitioner's allegations about the biases of prison officials do not strengthen his case because he has no constitutional right to have his inmate complaints ruled on by impartial decision makers and he has pointed to no statute that would give him such a right under state law. Therefore, he will be denied leave to proceed on this claim.

### ORDER

IT IS ORDERED that petitioner Thomas Reimann's request for leave to proceed *in forma pauperis* is GRANTED with respect to the following claims:

1. Respondent Rock violated petitioner's Eighth Amendment protection against cruel and unusual punishment by failing to implement a soft restraint restriction when petitioner is transported outside the prison;

2. Respondents Catherine Ferrey and Lizzie Tegels ordered petitioner transferred from the New Lisbon Correctional Institution to the Jackson Correctional Institution in November 2004 in retaliation for petitioner's having threatened to file a lawsuit regarding non-delivery of his mail; and

3. Respondents John Paquin and Ms. Tierney transferred petitioner from the Jackson Correctional Institution to the Stanley Correctional Institution in retaliation for his having filed inmate complaints.

FURTHER, IT IS ORDERED that

1. Petitioner is DENIED leave to proceed on all other claims raised in this lawsuit;

2. Respondents Matt Frank, Dan Benik, Becky Dressler, Brian Marx, Dawn Koeppen, Gerald Konitzer, Patrick Lynch, Sharon Zunker, John Ray and Dick Verhagen are DISMISSED from this case;

3. For the remainder of this lawsuit, petitioner must send respondents a copy of every paper or document that he files with the court. Once petitioner has learned what lawyer will be representing respondents, he should serve the lawyer directly rather than respondents. The court will disregard any documents submitted by petitioner unless petitioner shows on the court's copy that he has sent a copy to respondent or to respondents' attorney.

4. Petitioner should keep a copy of all documents for his own files. If petitioner does not have access to a photocopy machine, he may send out identical handwritten or typed copies of his documents.

5. The unpaid balance of petitioner's filing fee is $232.56; petitioner is obligated to pay this amount in monthly payments as described in 28 U.S.C. § 1915(b)(2).

6. Pursuant to an informal service agreement between the Attorney General and this court, copies of plaintiff's complaint and this order are being sent today to the Attorney General for service on the state defendants.